# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

RYAN PATTERSON,

     Plaintiff,

vs.                           No. CIV 17-1116 JB\GBW

NINE ENERGY SERVICE, LLC,

     Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiff's Reconsideration Motion, filed September 15, 2018 (Doc. 25)("Reconsideration Motion"). The Court held a hearing on October 25, 2018. The primary issues are: (i) whether the Court committed manifest legal error in its Memorandum Opinion and Order, 330 F. Supp. 3d 1280, filed August 30, 2018 (Doc. 21)("MOO"), where it relied on <u>Padilla v. State Farm Mutual Automobile Insurance Company</u>, 2003-NMSC-011, 68 P.3d 901 ("<u>Padilla</u>"), as well as <u>Cordova v. World Finance Corporation of New Mexico</u>, 2009-NMSC-021, 208 P.3d 901 ("<u>Cordova</u>"), and <u>Rivera v. American General Financial Services, Inc.</u>, 2011-NMSC-033, 259 P.3d 803 ("<u>Rivera</u>"), in concluding that, "although the injunctive relief provision in the Confidentiality and Dispute Resolution Agreement at 6, filed December 6, 2017 (Doc. 5-2)("Arbitration Agreement") is substantively unconscionable, it is also severable," MOO at 20, 330 F. Supp. 3d at 1287; and (ii) whether the Court should certify the question of whether the substantively unconscionable provision is severable to the Supreme Court of New Mexico for the Supreme Court of New Mexico's determination. The Court has carefully reconsidered its MOO and concludes that the injunctive relief provision in the Arbitration Agreement is severable, and the Court declines to

certify the question to the Supreme Court of New Mexico for its determination.

## FACTUAL BACKGROUND

The Court recites the factual background as stated in its MOO, as neither party has objected to the Court's recitation of facts in the MOO. The footnotes associated with the quoted text are also quoted in full from the MOO.

> Patterson worked for Nine Energy, an oilfield services company, from March to October of 2017. See First Amended Class Action Complaint ¶ 5, at 2, filed November 13, 2017 (Doc. 3)("Amended Complaint"). His "primary job duty consisted of operating pressure control equipment and tools." Amended Complaint ¶ 15, at 3. Nine Energy first offered Patterson employment via letter on February 28, 2017. See Letter from Sally Haynes, Human Resources Manager, to Ryan Patterson at 1-2, (dated February 28, 2017), filed January 3, 2018 (Doc. 14-2)("Offer Letter"). Patterson's Offer Letter states that his employment is contingent upon an enumerated list of items, including drug testing, physical capacity testing, and other things. See Offer Letter at 1. The Offer Letter does not mention arbitration. See Offer Letter at 1-2. Patterson accepted the employment offer by signing the Offer Letter on March 1, 2017. See Offer Letter at 2. Patterson did not begin work at Nine Energy until March 20, 2017. See Supplemental Declaration of Sharon Warren ¶ 7, at 2 (dated January 3, 2018), filed January 3, 2018 (Doc. 14-1).

> On March 1, 2017 -- the same day that Patterson signed the Offer Letter -- he also signed the Confidentiality and Dispute Resolution Agreement at 6, filed December 6, 2017 (Doc. 5-2)("Arbitration Agreement"). The Arbitration Agreement states that "the Company and the Employee agree to submit exclusively to final and binding arbitration any and all Disputes as defined herein in accordance with the following understanding and terms." Arbitration Agreement at 3. The Arbitration Agreement defines the word "dispute" as

>> all legal and equitable claims, demands, disputes, controversies, issues, and disagreements, of whatever nature or kind, whether in contract, tort, under statute or regulation, or any other law or source of legal obligation, including but not limited to those relating to, concerning, or arising out of this Agreement; the interpretation or subject matter of this Agreement or program . . . wages or other compensation received by or owed to any Employee, including

minimum wage and overtime pay.

Arbitration Agreement at 2. The Arbitration Agreement continues:

> Each Dispute shall be arbitrated on an individual basis. The parties forego and waive any right to join or consolidate their Disputes or claims with those of any other employee . . . or to assert any Disputes or claims in arbitration as a representative or as a member of a class. . . . Neither the Company nor any employee or applicant for employment may pursue any Dispute or claim on a class action, collective action, or consolidated basis or in a representative capacity on behalf of other individuals, or participate as a class or collective action member in such a proceeding. . . . The Parties waive any right to a jury trial and to pursue or participate in class or collective actions with respect to Disputes that are subject of this Agreement and for which a jury trial, class action, and collective action would otherwise be available.

Arbitration Agreement at 3. The Arbitration Agreement contains several other important provisions. See Arbitration Agreement at 3-4. One states that "arbitration shall be commenced by either Party filing a demand for arbitration with the AAA [1] within 60 days after such Dispute has arisen." Arbitration Agreement at 3. Another notes:

> Notwithstanding the provisions of this Agreement, the Company may bring an action in any court of competent jurisdiction for injunctive relief to enforce the Employee's obligations with respect to the confidentiality and protection of trade secrets and other non-public information belonging to the Company, or with respect to any non-competition, non-solicitation, or any other restrictive covenant provisions in any separate agreement between the Company and the Employee.

Arbitration Agreement at 4. Still another provision states: "The Parties acknowledge and agree that this Agreement and the Parties' employment relationship affect and involve interstate commerce, and that this Agreement is governed by the Federal Arbitration Act."[2] Arbitration Agreement at 5. Finally,

---

[1]AAA stands for the American Arbitration Association.

[2]9 U.S.C. §§ 1-16 ("FAA").

the Arbitration Agreement contains an integration clause, stating:

> No agreements or representations, oral or otherwise express or implied, with respect to the subject matter hereof have been made by either Party that are not set forth expressly in this Agreement. . . . This Agreement sets forth the entire agreement of the Parties hereto with respect to the subject matter herein, in particular the Parties' agreement regarding the protection of Confidential Information and the procedural mechanism for the final resolution of Disputes and supersedes all prior understandings, agreements, clauses, provisions, representations, or promises, whether oral or written, of the Parties to the extent they relate to or concern the subject matter herein.

Arbitration Agreement at 5. Patterson now alleges in this class action that Nine Energy failed to pay him and other employees overtime wages in violation of the New Mexico Minimum Wage Act, N.M. Stat. Ann. § 50-4-22(D). See Amended Complaint ¶ 3, at 1.

MOO at 2-3, 330 F. Supp. 3d, at 1287-89 (alteration in original).

## PROCEDURAL BACKGROUND

The Court adopts the procedural background until the filing of MOO, as the MOO recites

it. The footnotes associated with the quoted text are also quoted in full from the MOO.

Patterson filed his original Complaint on November 8, 2017. See Original Class Action Complaint, filed November 8, 2017 (Doc. 1)("Original Complaint"). Patterson subsequently filed the Amended Complaint on November 13, 2017. See Amended Complaint at 1. Nine Energy filed the Motion on December 6, 2017. See Motion at 1.

### 1.    The Motion.

Nine Energy moves the Court to dismiss this case for lack of subject-matter jurisdiction and to compel arbitration. See Motion at 1. Nine Energy first contends that Patterson's claims fall within the Arbitration Agreement's scope, because the Arbitration Agreement's provisions "cover all disputes, claims, or disagreements relating to Plaintiff's employment." Motion at 5. Nine Energy then argues that the Arbitration Agreement contains adequate consideration, asserting that "the

bargained for exchange in this case was Plaintiff's offer of employment with Nine Energy in exchange for signing the Confidentiality and Dispute Resolution Agreement as well as the Parties' mutual agreement to submit all employment disputes to arbitration." Motion at 6. Turning to the class action allegations, Nine Energy avers that the Arbitration Agreement expressly states that the parties waive any right to participate in a class or collective action regarding any disputes subject to the agreement. See Motion at 7-8. Nine Energy concludes that the Court should grant the Motion and compel Patterson to arbitrate his claims on an individual basis. See Motion at 8.

## 2. **The Response**.

Patterson responds. See Response to Defendant's Motion to Dismiss the First Amended Class Action Complaint and Compel Arbitration, filed January 2, 2018 (Doc. 13-1)("Response"). Patterson first asserts that the Arbitration Agreement is substantively unconscionable. See Response at 4. According to Patterson, the Arbitration Agreement section allowing Nine Energy to bring an action for injunctive relief in court to enforce an employee's confidentiality obligations, such as the protection of trade secrets, represents a unilateral carve-out favoring Nine Energy and is therefore unconscionable. See Response at 4-5. Second, Patterson avers that the Arbitration Agreement contains no consideration and is thus illusory. See Response at 5. According to Patterson "continued at-will employment cannot serve as consideration for an agreement to arbitrate," which Patterson asserts is the Arbitration Agreement's purported consideration. Response at 6-7.[3]

## 2. **The Reply**.

_____

[3]Patterson also submits a Notice of Supplemental Authorities, filed December 27, 2017 (Doc. 12)("Notice"). The Notice briefly mentions two cases discussing consideration in arbitration agreements. See Notice at 1. In the first case, the Honorable Richard Puglisi, then-United States Magistrate Judge for the United States District Court for the District of New Mexico, held that the plaintiff "was hired prior to agreeing to arbitration. Upon starting her employment she was asked to surrender a valuable right -- the right to a jury trial -- with no detriment to [the defendant] and no benefit to her. Thus, the purported agreement is unenforceable." Zamprelli v. Am. Golf Corp., No. CIV 00-0181 BB/RLP, at *4 (Doc. 46) (D.N.M. 2000)(Puglisi, M.J.). In the second case, the Honorable Bruce Black, United States District Judge, affirmed Magistrate Judge Puglisi's holding. See Zamprelli v. Am. Golf Corp., No. CIV 00-0181, 2001 WL 37119362, at *4 (D.N.M. 2001)(Black, J.).

Nine Energy replies. See Defendant's Reply in Support of Motion to Dismiss the First Amended Class Action Complaint and Compel Arbitration, filed January 3, 2018 (Doc. 14)("Reply"). Nine Energy first asserts that the Arbitration Agreement's consideration is Patterson's initial offer of employment and not continued at-will employment, because Patterson signed the Arbitration Agreement on the same day he accepted his employment offer and did not begin working for Nine Energy until twenty days later. See Reply at 5. Additionally, Nine Energy contends that "there was separate, valid consideration for the Agreement. In exchange for Plaintiff agreeing to arbitrate his employment-related disputes, Nine Energy promised not only to hire Plaintiff, but also to provide him access to its confidential information and trade secrets." Reply at 11.

Second, Nine Energy argues that, while part of the Arbitration Agreement may exempt Nine Energy from arbitration, other parts of the agreement contain "exclusions for numerous types of employment-related claims that Plaintiff alone would be able to pursue." Reply at 9. Nine Energy continues that "the exclusion of which Plaintiff complains relates to one limited form of relief -- injunctive relief -- that only the employer might be able to pursue to protect its confidential information and trade secrets." Reply at 9. According to Nine Energy, "[i]t is impossible that the Plaintiff would be able to bring such a claim, just as it is impossible that Nine Energy would be able to bring any of the claims excluded for Plaintiff (i.e. EEOC charges, NLRB charges, unemployment claims)." Reply at 9.

Finally, Nine Energy contends that, "[e]ven if the Court were to find this provision unconscionable, the Court can and should modify or sever the provision rather than invalidating the entire Agreement." Reply at 11. According to Nine Energy, the provision allowing it to bring an action for injunctive relief to protect confidential information "is not relevant or intertwined with the agreement to arbitrate compensation disputes, and severability is in line with the strong federal policy underlying the FAA favoring enforcement of arbitration agreements." Reply at 11-12.

### 3. The Surreply.

Patterson filed a surreply. See Surreply in Opposition to Defendant's Motion to Dismiss the Class Action Complaint and Compel Arbitration, filed January 10, 2018 (Doc. 16-1)("Surreply").[4] Patterson first asserts that Nine

---

[4]Patterson "requests that the Court grant leave to file Plaintiff's surreply." Surreply Motion at 2. Although Patterson's request was opposed to the extent that

Energy's employment offer was not contingent on signing the Arbitration Agreement, so the employment offer is not consideration for the agreement. See Surreply at 4. According to Patterson, Nine Energy's employment offer cannot be consideration for Patterson agreeing to arbitration, because the Offer Letter provides a list of contingencies, none of which include signing the Arbitration Agreement. See Surreply at 6. Further, according to Patterson, the Arbitration Agreement "contains an explicit merger clause that prevents the Offer Letter -- or any other oral/written agreement -- from being incorporated into the Arbitration Agreement or for serving as the consideration for the Agreement." Surreply at 6.

Second, Patterson takes issue with Nine Energy's assertion that it promised to provide confidential information and trade secrets to Patterson as consideration for him signing the Arbitration Agreement. See Surreply at 6-7. According to Patterson, the Arbitration Agreement "does not require Defendant to disclose any specific confidential information or trade secrets." Surreply at 7. Patterson adds that "no New Mexico court has reached the conclusion that an agreement to provide confidential information is adequate consideration for an agreement to arbitrate." Surreply at 7.

Third, Patterson argues for the first time that the Arbitration Agreement is unconscionable, because "the terms of the agreement prevent Plaintiff from vindicating his statutory rights under the FLSA."[5] Surreply at 7. Specifically,

---

his Surreply "advanced new issues or arguments," Surreply Motion at 4, the Court grants this request. In the summary judgment context, the Court has noted: "'When a moving party advances in a reply new reasons and evidence in support of its motion for summary judgment, the nonmoving party should be granted an opportunity to respond.'" Shattuck v. Lucero, No. CIV 04-1287, 2005 WL 2295555, at *2 (D.N.M. 2005)(Browning, J.)(quoting Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1164-65 (10th Cir. 1998)). This logic applies equally to motions to compel arbitration. If a party raises new evidence about an arbitration agreement in a reply, then the nonmovant should be able to respond. Here, Nine Energy introduces new evidence regarding the Arbitration Agreement in the reply, specifically the facts that Patterson signed the agreement on the same day as the Offer Letter and that Patterson did not begin working for Nine Energy until twenty days later. See Reply at 2-3; Offer Letter at 2. Given this new evidence, the Court will grant leave for Patterson to file a surreply. Also, there is no prejudice to Nine Energy, because the Court held a hearing, giving both parties a full opportunity to argue all issues.

[5]The FLSA is the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.

Patterson contends that the Arbitration Agreement's provision requiring arbitration to commence within 60 days after a dispute arises is unconscionable, because "the FLSA's limitations period may not be shortened by contract." Surreply at 8. Finally, Patterson avers that the Court should not sever any allegedly unconscionable provisions of the Arbitration Agreement, because the agreement contains no severance clause. See Surreply at 9-10. Patterson instead concludes that the Court should refuse to enforce the entire Arbitration Agreement and deny the Motion. See Surreply at 10.

### 4. **The Hearing.**

The Court held a hearing. See Draft Transcript of Motion Hearing at 1:10-11 (taken June 27, 2018)(Court)("Tr.").[6] Nine Energy began by asserting that "Mr. Patterson in the briefing concedes that this Court has recognized . . . that an offer of at will employment is sufficient consideration for an arbitration agreement. And that's exactly what we have here." Tr. at 4:19-24 (Mann). Patterson responded that the Arbitration Agreement's integration clause precludes any outside oral or written agreement -- including Patterson's employment offer -- from being incorporated into the Arbitration Agreement. See Tr. at 10:1-9 (Siegel). Patterson added that the Offer Letter lists several contingencies that Patterson had to meet to accept his employment offer, none of which includes signing the Arbitration Agreement. See Tr. at 13:2-9 (Siegel).

The parties then discussed unconscionability. See Tr. at 17:1-5 (Mann). Nine Energy asserted that Patterson "latches onto a portion of the agreement . . . that reserves to Nine the right to seek injunctive relief to enforce certain aspects of the agreement pertaining to confidential information. . . . What Mr. Patterson chooses to ignore [is] that the same paragraph on which he bases this argument contains multiple carve-outs solely for the . . . plaintiff here." Tr. at 17:1-14 (Mann). Nine Energy thus contended that the carve-outs in the Arbitration Agreement are bilateral and not unilateral. See Tr. at 18:3-6 (Mann).

Patterson then returned to the podium and asserted that the Arbitration Agreement is substantively unconscionable for the separate reason that it "has effectively shortened the statute of limitations period." Tr. at 22:15-16 (Siegel). Specifically, Patterson argued that the Arbitration Agreement shortens the limitations period from three years to sixty days. See Tr. at 22:21-24 (Siegel). Nine

---

[6]The Court's citations to the hearing's transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Energy responded that "the parties cannot limit statute[s] of limitations by contract. So even if that language is contained in the agreement [, were] it be attempted to be enforced it could not." Tr. at 25:9-13 (Mann).

The Court then asked if Nine Energy contended that, if the Court were to find any provision unconscionable, it should sever the provision rather than not enforcing the entire agreement. See Tr. at 28:25-29:7 (Court, Mann). Nine Energy responded that, if the Court concluded that a provision is unconscionable, then Nine Energy would prefer the rest of the agreement enforced. See Tr. at 29:8-16 (Mann). At the hearing's conclusion, the Court stated that it was inclined to grant the Motion. See Tr. at 35:2 (Court).

MOO at 3-10, 330 F. Supp. 3d, at 1289-92 (alterations in original).

## 5. **The MOO.**

In the MOO, the Court concludes "that the parties have not established diversity jurisdiction, so the Court will order the parties to show cause why the Court should not dismiss this case for lack of subject-matter jurisdiction." MOO at 1, 330 F. Supp. 3d at 1287. The Court also concluded that, "[o]n the merits, if the Court has subject-matter jurisdiction, the Court is inclined to conclude that the Arbitration Agreement contains adequate consideration, and, although the injunctive relief provision is substantively unconscionable, it is also severable." MOO at 1-2, 330 F. Supp. 3d at 1287. The Court stated that it was not inclined to hold the Arbitration Agreement's sixty-day limitations period unconscionable. See MOO at 2, 330 F. Supp. 3d at 1287. Finally, the Court stated in the MOO that, if the Court has subject-matter jurisdiction, it is "inclined to stay proceedings in this case, rather than dismissing it." MOO at 2, 330 F. Supp. 3d, at 1287. The Court stated that, if it had subject-matter jurisdiction, it is inclined to grant the Motion in part. See MOO at 2, 330 F. Supp. 3d at 1287.

The Court now summarizes the portions of the Court's MOO that Patterson requests the Court to reconsider -- specifically, the severability analysis of the injunctive relief provision. In the MOO, the Court began its analysis regarding the injunctive relief provision's severability by quoting Cordova: "If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term." MOO at 41, 330 F. Supp. 3d at 1311 (internal quotation marks omitted)(quoting Cordova, 2009-NMSC-021, ¶ 39, 208 P.3d at 911). The Court also cited to the Supreme Court of New Mexico's opinion in Dalton v. Santander Consumer USA, Inc., for the proposition that "[c]ourts may render a contract or portions of a contract unenforceable under the equitable doctrine of unconscionability when the terms are 'unreasonably favorable to one party while precluding a meaningful choice of the other party.'" MOO at 41, 330 F. Supp. 3d at 1311 (emphasis omitted)(quoting Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 6, 385 P.3d at 621 (internal quotation marks omitted)(quoting Cordova, 2009-NMSC-021, ¶ 21, 208 P.3d at 907)). The Court cited to Padilla for the principle that, if a provision is severable, the agreement that remains after its severance will be a "mutual agreement to binding arbitration." MOO at 41, 330 F. Supp. 3d at 1311 (internal quotation marks omitted)(quoting Padilla, 2003-NMSC-011, ¶ 18, 68 P.3d at 909). The Court concluded that, without the substantively unconscionable injunctive relief provision, the Arbitration Agreement is a mutual agreement to binding arbitration and, furthermore, that it "would make little sense for the Court to trash the entire Arbitration Agreement because of an unconscionable provision unrelated to this case." MOO at 42, 330 F.

Supp. 3d at 1311. For these reasons, the Court concluded that the injunctive relief provision is severable. See MOO at 42, 330 F. Supp. 3d at 1311.

The Court also performed a severability analysis for the sixty-day limitations period provision at issue in the Arbitration Agreement. See MOO at 45-46, 330 F. Supp. 3d, at 1312-14. The Court compared Rivera, in which the Supreme Court of New Mexico struck an entire arbitration agreement, with Padilla, in which the Supreme Court of New Mexico upheld the agreement and severed only the unconscionable provision. See MOO at 45, 330 F. Supp. 3d, at 1313 (discussing Rivera and Padilla). In Rivera, the Court noted, the Supreme Court of New Mexico stated that "it would not rewrite a contract 'that is laced with unenforceable terms that were central to the original mechanism [] for resolving disputes between the parties.'" MOO at 45, 330 F. Supp. 3d, at 1313 (alterations in Rivera)(internal quotations omitted)(quoting Rivera, 2011-NMSC-033, ¶ 56, 259 P.3d at 819 (quoting Cordova, 2009-NMSC-021, ¶ 40, 208 P.3d at 912)). The Court concluded that the sixty-day provision is not central to the Arbitration Agreement and could be "severed without substantially altering the method of dispute resolution contractually agreed on by the parties." MOO at 46, 330 F. Supp. 3d, at 1313 (quoting Rivera, 2011-NMSC-033, ¶ 56, 259 P.3d at 819). The Court stated that severance is "an appropriate remedy, because both federal and New Mexico law reflect a public policy in favor of arbitration agreements." MOO at 46, 330 F. Supp. 3d, at 1313 (citing Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1488-89 (10th Cir. 1994)("There is a strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration."); United Tech. & Res., Inc. v. Dar Al

Islam, 1993-NMSC-005, ¶ 11, 846 P.2d 307, 309 ("The legislature and the courts of New Mexico 'have expressed a strong policy preference for resolution of disputes by arbitration.'")).

      **6.**      **The Reconsideration Motion.**

In the Reconsideration Motion, Patterson contends that the Court committed manifest legal error in reaching the MOO's conclusion that, "although the injunctive relief provision in the Arbitration Agreement is substantively unconscionable, it is also severable." Reconsideration Motion at 1 (quoting MOO at 20, 330 F. Supp. 3d at 1305). Patterson agrees with the Court's determination that the injunctive relief provision is a unilateral carve-out benefitting exclusively the stronger party, and therefore substantively unconscionable and unenforceable under New Mexico law. See Reconsideration Motion at 1. Patterson contends that the Court should have followed Cordova, and Rivera, in determining whether the provision could be severed from the Arbitration Agreement, and that the Court's reliance on Padilla, constitutes manifest legal error based on the Supreme Court of New Mexico's decision in Cordova. See Reconsideration Motion at 1-2.

Patterson contends that the Supreme Court of New Mexico distinguished Padilla in Cordova as follows:

> In *Padilla*, 2003-NMSC-011, ¶¶ 10, 18, 133 N.M. 661, 68 P.3d 901, this Court struck from a contract an invalid post-arbitration appeal provision but left intact the underlying mutual arbitration clause. By contrast, the invalidity in this case involves the arbitration scheme itself, not just the procedures for appeal to the courts after the arbitration phase is over. We are reluctant to try to draft an arbitration agreement the parties did not agree on. This is particularly so in light of the categorization in the agreements of specific kinds of access to the courts World Finance had insisted on for itself. As we concluded in *Fiser* [v. Dell Comp. Corp.], 2008-NMSC-046, ¶ 24, 144 N.M. 464, 188 P.3d 1215, we must strike down the

arbitration clause in its entirety to avoid a type of judicial surgery that would inevitably remove provisions that were central to the original mechanisms for resolving disputes between the parties. As courts in similar situations have found appropriate under these circumstances, we determine that the arbitration agreements are unenforceable in their entirety, and must be severed from the accompanying loan agreements.

Cordova, 2009-NMSC-021, ¶¶ 39-40, 208 P.3d at 911. Patterson contends that the MOO "contravenes Cordova's precedent that unilateral carve-out agreements are non-severable under New Mexico law." Reconsideration Motion at 2. Patterson argues that Padilla's provision, because it is a post-arbitration provision, presented a different case, and that the Padilla court's analysis, therefore, is inapposite. See Reconsideration Motion at 2. Patterson asks, accordingly, that the Court grant the Reconsideration Motion, deny Nine Energy's Motion to Dismiss, and compel discovery in accordance with Supreme Court of New Mexico precedent. See Reconsideration Motion at 2. Patterson requests, in the alternative, that the Court certify the severability question to the Supreme Court of New Mexico. See Reconsideration Motion at 2-3. Patterson argues that rule 54(b) of the Federal Rules of Civil Procedure permits the Court to freely reconsider the MOO, with no limit or governing standard on its ability to do so, other than that it must do so "before the entry of judgment." Reconsideration Motion at 3 (quoting Anderson Living Tr. v. WPX Energy Prod., LLC, No. CIV 12-0040 JB/KBM, 2015 WL 9703298 (D.N.M. Dec. 31, 2015)(Browning, J.)(citing Fed. R. Civ. P. 54(b); Been v. O.K. Indus., 495 F.3d 1217, 1225 (10th Cir. 2007)).

Patterson asserts that, like the arbitration clauses in Rivera and Cordova, the clause at issue here is so central to the Arbitration Agreement that it may not be separated, irrespective of any savings clause. See Reconsideration Motion at 3 (citing Figueroa v. THI of N.M. at Casa Arena

Blanca, LLC, 2013-NMCA-077, ¶ 39, 306 P.3d 480, 494).  Patterson asserts that the Court correctly determined that the injunctive relief provision at issue is substantively unconscionable by relying on Rivera and Cordova:

> In light of the Supreme Court of New Mexico precedent in Rivera v. American General Financial Services, Inc., 2011-NMSC-033, ¶¶ 51-54, 150 N.M. 398, 259 P.3d at 818-19, and Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 20, 146 N.M. 256, 208 P.3d at 907, the Court is inclined to conclude that the Supreme Court of New Mexico would hold that this unilateral carve-out to benefit exclusively the stronger party is substantively unconscionable under New Mexico law and thus unenforceable.

Reconsideration Motion at 4 (quoting MOO at 21, 330 F. Supp. 3d, at 1310).

Patterson argues that, although the Court correctly determined that the injunctive relief provision is substantively unconscionable, the Court's determination that the provision is severable constitutes manifest legal error.  See Reconsideration Motion at 5.  Patterson contends that the Court should not have relied on Padilla in determining the provision's severability, because Padilla dealt with a "post-arbitration appeal provision that has nothing to do with the unilateral carve out for injunctive relief here."  Reconsideration Motion at 4 (internal quotation marks omitted)(quoting Padilla, 2003-NMSC-011, ¶¶ 10, 18, 68 P.3d at 905, 908-09).  Patterson argues that the Supreme Court of New Mexico in Padilla never considered the severability of unilateral carve-out provisions, whereas the Supreme Court of New Mexico considered a unilateral carve-out in Cordova and determined that the unilateral carve-out could not be severed from the arbitration agreement particularly "in light of the categorization in the agreements of specific kinds of access to the courts [defendant] had insisted on for itself."  Reconsideration Motion at 5 (alteration in Reconsideration Motion)(quoting Cordova, 2009-NMSC-021, ¶¶ 39-40, 208 P.3d at 911).

Patterson argues that the parties never agreed on the arbitration that the Court, by severing the injunctive relief provision, drafted, because the provision that the Court severed involves the arbitration scheme itself.  <u>See</u> Reconsideration Motion at 5.  Patterson cites to two Court of Appeals of New Mexico cases determining that unreasonably one-sided provisions exempting certain claims from arbitration could not be severed.  <u>See</u> Reconsideration Motion at 5-6 (citing <u>Ruppelt v. Laurel Healthcare Providers, LLC</u>, 2013-NMCA-014, ¶¶ 19-21, 293 P.3d 902, 908-09; <u>Abram ex rel. Lopez v. Paloma Blanca Health Care Assocs., L.L.C.</u>, No. 31,850, 2013 WL 4516398, at *1 (N.M. Ct. App. June 17, 2013)).  Patterson argues that, because the Arbitration Agreement lacks a savings or severance clause manifesting the parties' intent to save the contract if a provision is rendered unenforceable, and, under New Mexico law, the parties' manifested intention governs the severability determination, the Court committed manifest legal error in severing the provision despite the parties' lack of manifested intention to save the agreement.  <u>See</u> Reconsideration Motion at 7-8 (citing <u>Arrow Gas Co. of Dell City v. Lewis</u>, 1962-NMSC-145, ¶ 24, 377 P.2d 655, 659; <u>Fancher v. Bd. of Comm'rs of Grant Cty.</u>, 1921-NMSC-039, ¶ 63, 210 P. 237, 248).  Patterson asserts that even if the parties had included a savings clause, the unilateral carve-out would still not be severable under New Mexico Law.  <u>See</u> Reconsideration Motion at 8 n.9.

**7.      The Reconsideration Response.**

On October 5, 2018, Nine Energy responded to the Reconsideration Motion.  <u>See</u> Defendant's Memorandum in Opposition to Plaintiff's Reconsideration Motion, filed October 5, 2018 (Doc. 27)("Reconsideration Response").  Nine Energy argues that the Court should reject the Reconsideration Motion in its entirety, "because even if the injunctive relief provision in the

[Arbitration Agreement] is unconscionable, the Court did not commit clear legal error by severing it, and Plaintiff has not met his burden to demonstrate that certification is proper." Reconsideration Response at 1. First, Nine Energy argues that the Reconsideration Motion is procedurally deficient, because: (i) it prematurely seeks reconsideration before the Court has dismissed the action or compelled arbitration; and (ii) Patterson does not seek the Court's leave to file what Nine Energy contends is no more than a supplemental briefing, not requiring a response. See Reconsideration Response at 1 n.1.[7]

Nine Energy argues that Patterson uncritically analyzes Cordova, which confronts "predatory lending agreements." Reconsideration Response at 1. Nine Energy contends that the Supreme Court of New Mexico has never held that an unconscionable arbitration provision may not be severed as a matter of law and contends that the Supreme Court of New Mexico has never overruled Padilla. See Reconsideration Response at 1-2. First, Nine Energy argues that Cordova and cases like it are distinguishable from the present case. See Reconsideration Response at 2. Nine Energy asserts that the arbitration agreement at issue in Cordova was attached to a loan agreement and permitted the lender to litigate all claims important to it, while prohibiting borrowers from litigating any claims important to them. See Reconsideration Response at 2. Nine

---

[7]Although the parties do not address the issue of appealability in their briefings, the Court notes that an order to stay proceedings and compel arbitration is not a final judgment on the merits and is not immediately appealable. See Comanche Indian Tribe of Okla. v. 49, L.L.C., 391 F.3d 1129, 1133 (10th Cir. 2004)("The district court's order staying the proceedings and compelling arbitration was not a final decision on the merits. As such, we lack jurisdiction over this appeal . . . ."). See also Armijo v. Prudential Ins. of Am., 72 F.3d 793, 796-97 (concluding that, if a motion to stay had been properly granted, "the order granting arbitration would then not have been a final order" and therefore not immediately appealable).

Energy contends that Patterson's reliance on Cordova ignores the differences between the Cordova agreement, and the Arbitration Agreement. See Reconsideration Response at 3. Nine Energy contends that the Arbitration Agreement is unlike that in Cordova, because: (i) "the Agreement does not concern a predatory lending or consumer loan agreement," Reconsideration Response at 3; (ii) the Agreement permitted Patterson to pursue multiple claims outside of arbitration, and to file complaints with State and Federal administration agencies which could litigate claims against Nine Energy on Patterson's behalf, see Reconsideration Response at 3; and (iii) the injunctive relief provision at issue is narrow in scope and situated in a stand-alone section of the Agreement, Nine Energy "can only seek injunctive relief to enforce Plaintiff's obligations under restrictive covenants," and there is a low likelihood that Nine Energy could enforce the restrictive covenants against Patterson, Reconsideration Response at 3. Nine Energy argues, accordingly, that the Arbitration Agreement is less one-sided than the agreement in Cordova, and that the injunctive relief provision that the Court severed in the MOO is not so central to the Arbitration Agreement that it is incapable of severance. See Reconsideration Response at 4.

Next, Nine Energy argues that Padilla, in which the Supreme Court of New Mexico recognized a court's discretion to sever a provision in an arbitration agreement, is still good law. See Reconsideration Response at 4. Nine Energy argues that even Cordova recognized the remedy of severance:

> There are two possible remedial actions we can take to give effect to our holding that the one-sided arbitration provisions separately attached to the loan agreements are unenforceable: We can strike the arbitration provisions in their entirety, or we can attempt to refashion parts of them into a fair and balanced arbitration agreement.

Reconsideration Response at 5 (emphasis and internal quotation marks omitted)(quoting <u>Cordova</u>, 2009-NMSC-021, ¶ 39, 208 P.3d at 911).  Nine Energy argues that the Court should not read <u>Cordova</u> to mean that courts may never sever a provision from an arbitration provision when equity demands.  <u>See</u> Reconsideration Response at 5.

Last, Nine Energy argues that the Court should decline to grant certification. <u>See</u> Reconsideration Response at 6.  Nine Energy argues that the Arbitration Agreement's enforceability "is not determinative of the merits of Plaintiff's underlying claims." Reconsideration Response at 6.  Nine Energy also argues that the Reconsideration Motion does not present a "novel, significant, and unsettled issue of law under the New Mexico Constitution, nor does it present an issue of significant public interest."  Reconsideration Response at 6.  Nine Energy argues, accordingly, that Patterson has not met his burden to demonstrate that certification is warranted.  <u>See</u> Reconsideration Response at 5.

## 8.    The Reconsideration Reply.

On October 20, 2018, Patterson replied to Nine Energy.  <u>See</u> Reply in Support of Reconsideration Motion, filed October 20, 2018 (Doc. 29)("Reconsideration Reply").  In the Reconsideration Reply, Patterson asserts:

> Defendant was Plaintiff's employer and drafted a form contract without any input or negotiations with Plaintiff.  Defendants took advantage of being the stronger party by drafting a one-sided, stand-alone arbitration agreement ("Agreement") that contains a non-mutual exclusion from the "Agreement" that allows it unilateral access to the courts to obtain injunctive relief to enforce any restrictive covenant in any separate agreement between the parties.

Reconsideration Reply at 1 (emphasis omitted).  Patterson reiterates the arguments from the Reconsideration Motion, <u>see</u> Reply at 1-2, and asserts that the unilateral carve-out provision here

contains no language that limits Nine Energy's unilateral ability to seek permanent injunctive relief to enforce Patterson's obligations with respect to any other restrictive covenant in any other agreement between Patterson and Nine Energy in any court of competent jurisdiction, see Reconsideration Reply at 2. Patterson contends, therefore, that the provision at issue here is more unconscionable than the provision at issue in <u>Cordova</u>, because, here, Nine Energy can take advantage of its employees by having them sign separate agreements with restrictive covenants and then enforce those agreements at will. See Reconsideration Reply at 2-3.

Patterson argues that courts of other jurisdictions agree with the Supreme Court of New Mexico that unfairly one-sided contract provisions are unconscionable and non-severable. <u>See</u> Reconsideration Reply at 3-4 (citing <u>Taylor v. Butler</u>, 142 S.W. 3d 277, 280 (Tenn. 2004); <u>Batory v. Sears, Roebuck & Co.</u>, 456 F. Supp. 2d 1137 (D. Ariz. 2006)). Patterson next addresses Nine Energy's distinction between the unilateral judicial relief mechanism at issue and the lender-borrower provisions in <u>Cordova</u> and like cases. <u>See</u> Reconsideration Reply at 4. Patterson argues that the Supreme Court of New Mexico rejected this distinction, explaining that an employer may not reserve the unilateral right to grant the same relief as a court. <u>See</u> Reconsideration Reply at 4. Patterson argues that Nine Energy poses more of a threat to Patterson as an employer than Nine Energy would pose if it were a lender, because the "Defendant has made it pertinently clear that it intends to use the unilateral provision to its employees' disadvantage in regards to 'any other restrictive covenant provisions in any separate agreement between the Company and the Employee.'" Reconsideration Reply at 4 (quoting Arbitration Agreement ¶ H, at 4). Patterson contends that the provision at issue is more unconscionable than the provision at issue in <u>Rivera</u>,

because Patterson cannot identify the subject matter which the Arbitration Agreement controls. See Reconsideration Reply at 4.

Patterson next argues that California courts faced with similar issues, and to which Patterson contends the Supreme Court of New Mexico often cites, do not sever similar agreements. See Reconsideration Reply at 5. Patterson requests that the Court follow the guidance of the United States Court of Appeals for the Ninth Circuit and decline to sever the provision. See Reconsideration Reply at 5-6. Patterson argues that, under United States Court of Appeals for the Tenth Circuit precedent, the Court should strictly construe the Arbitration Agreement against Nine Energy as the drafter. See Reconsideration Reply at 6 & n.3 (citing Dumais v. Am. Golf Corp., 299 F.3d 1216, 1219 (10th Cir. 2002)).

Next, Patterson cites to decisions by the Honorable Karen B. Molzen, United States Magistrate Judge for the District of New Mexico, and by the Honorable Gregory B. Wormuth, United States Magistrate Judge for the District of New Mexico, in which Judge Molzen and Judge Wormuth determined that the Court's task in deciding a provision's severability is to determine "whether the arbitration clause must be struck in its entirety or can be reformed into a 'fair and balanced' agreement." Reconsideration Reply at 9 (citing Clark v. UnitedHealth Grp., Inc., No. CIV 13-0372 MV/CG, 2018 WL 2932735 (D.N.M. June 12, 2018)(Molzen, J.))(quoting Gorman v. S/W Tax Loans, Inc., No. CIV 14-0089 GBW/KK, 2015 WL 12751710, at *8 (D.N.M. March 17, 2015)(Wormuth, M.J.)). Patterson contends that the most important question in an arbitration provision is what claims must be resolved in arbitration -- the question that the unilateral carve-out provision at issue addresses. See Reconsideration Reply at 10.

Patterson likens this case to several other New Mexico cases which have held that unilateral carve-outs favoring the stronger party are unenforceable and not severable. See Reconsideration Reply at 10-11 (citing Ruppelt v. Laurel Healthcare Providers, LLC, 2013-NMCA-014, 293 P.3d 902; Figueroa v. THI of N.M. at Casa Arena Blanca, LLC, 2013-NMCA-077, 306 P.3d 480; Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, 259 P.3d 803; Cordova, Dalton v. Santander Consumer U.S.A., Inc., 2015-NMCA-030, 345 P.3d 1086, rev'd on other grounds, 2016-NMSC-035, 385 P.3d 619; Pool v. DriveTime Car Sales Co., LLC, No. 33,894, 2016 WL 3416372, at *6 (N.M. Ct. App. May 10, 2016)).

### 9. The Notice of Supplemental Authorities.

On October 25, 2018, Patterson filed a Notice of Supplemental Authorities. See Notice of Supplemental Authorities, filed October 25, 2018 (Doc. 30)("Reconsideration Notice"). In the Reconsideration Notice, Patterson asserts that, since the time he filed his Reconsideration Reply, he has become aware of a District of New Mexico case supporting his position, which Patterson requests the Court consider. See Reconsideration Notice at 1. Patterson cites to Tatum v. ProBuild Co., LLC, No. CIV 12-1060 LH/LFG, 2013 WL 12329840, at *10 (D.N.M. July 17, 2013)(Hansen, J.), and contends that the Honorable Leroy Hansen, United States Senior District Judge for the District of New Mexico, concludes in Tatum v. ProBuild Co., LLC that a nearly mutual injunctive relief clause for the enforcement of restrictive covenants rendered the entire arbitration agreement at issue unenforceable. See Reconsideration Notice at 1. Patterson provides the Court with a copy of Judge Hansen's opinion in Tatum v. ProBuild Co., LLC. See Tatum v. ProBuild Co., LLC Opinion, filed October 25, 2018 (Doc. 30-1).

10. **The Hearing.**

The Court held a hearing on October 25, 2018. See Draft Transcript of Reconsideration Motion Hearing at 1 (taken Oct. 25, 2018)(Court)("Oct. 25 Tr.").[8] Patterson began by asserting that the Court's decision in the MOO is contrary to Supreme Court of New Mexico precedent, which, Patterson contended, dictates that the provision at issue "renders the agreement unenforceable, and severance is not proper because the provision is central to the agreement." Oct. 25 Tr. at 2:20-22 (Siegel). Patterson asserted that, while the Court based its substantive unconscionability determination in the MOO on Rivera and Cordova, it cited to neither Cordova nor Rivera in its analysis of the appropriateness of severance of the provision at issue. See Oct. 25 Tr. at 2:23-25 (Siegel); id. at 3:7-10 (Siegel). Patterson contends that the Court instead relied on Padilla, which Patterson alleges was "improper," because Padilla, unlike the present case, concerns an appeals provision that came into effect only after arbitration was over. Oct. 25 Tr. at 3:10-17 (Siegel). Patterson argues that, in Clay v. New Mexico Title Loans, Inc., 2012-NMCA-102, ¶ 40, 288 P.3d 888, 900, the Court of Appeals of New Mexico concluded that an escape hatch appeals clause in an arbitration agreement was severable by citing to Padilla for the proposition that an appeal provision was severable because it governed only a post-award proceeding. See Oct. 25 Tr. at 3:16-23 (Siegel).

Patterson asserted: "This all boils down to whether the unilateral carve-out for judicial relief is central to the agreement or collateral." Oct. 25 Tr. at 3:23-4:2 (Siegel). Patterson

---

[8]The Court's citations to the hearing's transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

contended that the carve-out provision at issue in the Arbitration Agreement is central to the Arbitration Agreement, and therefore, the entire Arbitration Agreement is unenforceable if it is unconscionable. See Oct. 25 Tr. at 4:2-12 (Siegel). Patterson argues that the key is that the provision at issue is not merely a unilateral carve-out, but a unilateral carve-out for judicial relief. See Oct. 25 Tr. at 4:18-21 (Siegel). Patterson argues that, although the Court in its MOO and Nine Energy in its briefing pointed to provisions in the Arbitration Agreement allowing Patterson to bring unemployment or workers compensation claims outside of the arbitration context, many courts have found that these provisions are not carve-outs for judicial relief, because they have their own adjudicatory frameworks. See Oct. 25 Tr. at 4:2-5:3 (Siegel). Patterson asserted that the provision at issue is entirely one-sided. See Oct. 25 Tr. at 5:6-8 (Siegel).

The night before the hearing, Patterson discovered Tatum v. ProBuild Co., LLC., and filed the Notice of Supplemental Authorities to inform the Court of that case. See Oct. 25 Tr. at 5:9 (Siegel). See also Tatum v. ProBuild Co., LLC Opinion at 1. Patterson contended that the most important claim he might raise against Defendant is for injunctive relief. See Oct. 25 Tr. at 6:4-6 (Siegel). Patterson contended that in the Arbitration Agreement, Nine Energy is the only person that has the unilateral right to go to court and enforce the provisions for injunctive relief. See Oct. 25 Tr. at 7:8-10 (Siegel).

Nine Energy then argued that Senior Judge Hansen did not discuss severability at all in Tatum v. ProBuild Co., LLC. See Oct. 25 Tr. at 9:7-11 (Mann). Nine Energy noted that, in several of the cases which Patterson cites, the courts opted to sever the provisions at issue. See Oct. 25 Tr. at 9:10-14 (Mann). Nine Energy argued that the "key, as the Court noticed, is whether the

substantive unconscionability clause is essential to the agreement as a whole." Oct. 25 Tr. at 9:14-16 (Mann). Nine Energy noted that the provision at issue in the Arbitration Agreement contains eleven paragraphs, addressing eleven separate points, but that the Court opted to strike only one sentence in one paragraph out of eleven, so that the remaining agreement requires both parties to submit all disputes to arbitration. See Oct. 25 Tr. at 9:20-25 (Mann). Nine Energy argued that the Court found a justifiable way to sever and quoted from the MOO: "Further, it would make little sense for the Court to trash the entire Arbitration Agreement because of an unconscionable provision unrelated to this case." Oct. 25 Tr. at 10:12-15 (Mann)(quoting MOO at 42, 330 F. Supp. 3d, at 1311).

Patterson then argued that the provision at issue pertains to the most likely actions that Nine Energy might bring against its employees. See Oct. 25 Tr. at 11:3-5 (Siegel). Patterson reiterated that no case in New Mexico has allowed the severance of an arbitration agreement provision that is a unilateral carve-out for judicial relief. See Oct. 25 Tr. at 11:5-8 (Siegel). Patterson argues that Nine Energy imposed the Arbitration Agreement on Patterson without negotiations and that Nine Energy is now asking the Court to "save them from themselves." Oct. 25 Tr. at 11:8-13 (Siegel).

Patterson quoted from Cordova:

By contrast, the invalidity in this case involves the arbitration scheme itself, not just the procedures for appeal to the courts after the arbitration phase is over. We are reluctant to try to draft an arbitration agreement the parties did not agree on. This is particularly so in light of the categorization in the agreements of specific kinds of access to the Courts World Finance had insisted on for itself.

Oct. 25 Tr. at 11:14-25 (Siegel)(internal quotation marks omitted)(quoting Cordova, 2009-NMSC-

021, ¶ 40, 208 P.3d at 911).  Patterson argued that Nine Energy, like World Finance in <u>Cordova</u>, insisted that it have access to the courts to apply for injunctive relief.  <u>See</u> Oct. 25 Tr. at 12:1-2 (Siegel).

Patterson then argued that, in <u>Tatum v. ProBuild Co., LLC</u>, Senior Judge Hansen concluded that the provision at issue was one-sided, because both parties could not go to court to address the same occurrence at the same time.  <u>See</u> Oct. 25 Tr. at 12:3-7 (Siegel).  Patterson contends that, unlike in <u>Cordova</u> and <u>Rivera</u>, here the parties do not have bilateral access to the courts -- and that this is a major distinction between this case, and <u>Cordova</u> and <u>Rivera</u>.  <u>See</u> Oct. 25 Tr. at 12:7-13 (Siegel).  Patterson contended that the Arbitration Agreement here explicitly states that only Nine Energy may go to court.  <u>See</u> Oct. 25 Tr. at 12:13-22 (Siegel).

The Court indicated that, while it believed it had "worked hard on the opinion," it would go back and look at the cases to which the parties referred in the hearing and would try to get them an opinion by the end of November.  <u>See</u> Oct. 25 Tr. at 13:13-23 (Court).  This is the Memorandum Opinion and Order that the Court promised the parties at the hearing.

## LAW REGARDING ARBITRATION AGREEMENTS

An arbitration agreement is a contract or a provision in a contract whereby parties agree to "settle by arbitration a controversy . . . arising out of such contract or transaction."  9 U.S.C. § 2. Both federal and New Mexico law reflect a public policy in favor of arbitration agreements. <u>See</u> <u>Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 39 F.3d at 1488-89 ("There is a strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration."); <u>United Tech. & Res., Inc. v. Dar Al Islam</u>, 1993-NMSC-005, ¶ 11, 846 P.2d at 309

- 25 -

("The legislature and the courts of New Mexico 'have expressed a strong policy preference for resolution of disputes by arbitration.'"(quoting Dairyland Ins. v. Rose, 1979-NMSC-021, ¶ 14, 591 P.2d at 284)).  To be enforceable, an arbitration agreement must be validly formed pursuant to state contract law principles -- e.g., the arbitration agreement must not be illusory or unconscionable.  See Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 8, 90 P.3d 466, 469 ("To determine whether the agreement to arbitrate is valid, courts look to general state contract law . . . .").  See also Jerry Erwin Assocs., Inc. v. Estate of Asher by & through Zangara, 290 F. Supp. 3d 1213, 1249 (D.N.M. Nov. 30, 2017)(Browning, J.)(concluding that where parties to an arbitration agreement agreed to submit all claims to arbitration, the parties intended that agreement to mean that no claims are excluded from the arbitration agreement's scope (citing Christmas v. Cimmaron Realty Co., 1982-NMSC-079, ¶ 8, 648 P.2d 788, 790 (holding that "the terms of the arbitration agreement are to be interpreted by the rules of contract law" and that "courts will apply the plain meaning of contract language as written in interpreting terms of a contract"))).

## 1.  Federal Law.

"The FAA reflects the fundamental principle that arbitration is a matter of contract." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 67 (2010).  "[T]he basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate." Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 270 (1995).  "The FAA thereby places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms."  Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 67-68 (citations omitted).

Under § 4 of the FAA, a party "aggrieved" by another party's failure "to arbitrate under a written agreement for arbitration" may petition a federal court "for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. If one party's refusal to arbitrate under a written agreement aggrieves another party, the district court, upon petition, "shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. Section 2, the "primary substantive provision of the Act," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 64.

Upon a finding that a matter is referable to arbitration, the FAA also indicates that the district court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Notwithstanding 9 U.S.C. § 3's terms, however, several Courts of Appeals have concluded that "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc., 252 F.3d 707, 709-10 (4th Cir. 2001). See Green

v. Ameritech Corp., 200 F.3d 967, 973 (6th Cir. 2000)("The weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration."); Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 156 n.21 (1st Cir. 1998); Alford v. Dean Witter Reynolds, Inc., 975 F.2d 1161, 1164 (5th Cir. 1992); Sparling v. Hoffman Constr. Co., 864 F.2d 635, 638 (9th Cir. 1988).

The Tenth Circuit has cautioned that, when one of the parties petitions the court to stay an action pending compulsory arbitration, 9 U.S.C. § 3's mandatory language is binding, and it is error for the court to dismiss the action. See Adair Bus Sales, Inc. v. Blue Bird Corp., 25 F.3d 953, 955 (10th Cir. 1994). When, however, the party seeking to compel arbitration requests the court for dismissal, and there is no evidence in the record of any party requesting a stay, it is not error for the district court to dismiss the case. See Armijo v. Prudential Ins. of Am., 72 F.3d 793, 797 (10th Cir. 1995); Evangelical Lutheran Good Samaritan Soc'y v. Moreno, 277 F. Supp. 3d 1191, 1210 (D.N.M. 2017)(Browning, J.); Cornoyer v. AT&T Mobility Servs., LLC, No. CIV 15-0474, 2016 WL 6404853, at *7-8 (D.N.M. Oct. 5, 2016)(Browning, J.); Thompson v. THI of New Mexico at Casa Arena Blanca, LLC, No. CIV 05-1331, 2006 WL 4061187, at *16 (D.N.M. Sept. 12, 2006)(Browning, J.)(dismissing a case where the plaintiff neither requested a stay nor argued that some claims may not be arbitrable).

2.    **New Mexico Law**.

New Mexico's Uniform Arbitration Act, N.M. Stat. Ann. §§ 44-7a-1 to -7a-32 ("NMUAA"), provides that an agreement to submit any controversy arising between the parties to arbitration is "valid, enforceable and irrevocable except upon a ground that exists at law or in

equity for the revocation of a contract." N.M. Stat. Ann. § 44-7A-7(a). If the court concludes that there is an enforceable agreement to arbitrate, it shall order the parties to arbitrate. See N.M. Stat. Ann. § 44-7A-8(a). Where the provision for arbitration is disputed, the court's function is to determine whether there is an agreement to arbitrate and to order arbitration where an agreement is found. See N.M. Stat. Ann. § 44-7A-8(a). Courts must decide whether the parties agreed to submit their claims to arbitration. See La Frontera Ctr., Inc., v. United Behavioral Health, Inc., 268 F. Supp. 3d 1167, 1206 (D.N.M. 2017)(Browning, J.)(citing Belnap v. Iasis Healthcare, 844 F.3d 1272, 1280 (10th Cir. 2017)("Because arbitration is simply a matter of contract, . . . the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute . . . ." (internal quotation marks and citations omitted))). The Supreme Court of the United States of America has held that "courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e] evidence that they did so.'" Perez v. Qwest Corp., 883 F. Supp. 2d 1095, 1113-14 (D.N.M. 2012)(Browning, J.)(alterations in Perez v. Qwest Corp.)(quoting Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 79 (2010).

Like the federal courts' interpretation of the FAA, New Mexico courts have viewed the NMUAA as an expression of a public policy favoring arbitration. See United Tech. & Res., Inc. v. Dar Al Islam, 1993-NMSC-005, ¶ 11, 846 P.2d at 309 ("The legislature and the courts of New Mexico 'have expressed a strong policy preference for resolution of disputes by arbitration.'" (quoting Dairyland Ins. v. Rose, 1979-NMSC-021, ¶ 14, 591 P.2d at 284)). More specifically, New Mexico courts have construed the NMUAA's legislative purpose as an attempt to reduce the court's caseload. See Bd. of Educ. Taos Mun. Sch. v. Architects, Taos, 1985-NMSC-102, ¶ 10,

709 P.2d 184, 186 ("A concern for preserving scarce judicial resources lies at the heart of the preference for arbitration."); Dairyland Ins. v. Rose, 1979-NMSC-021, ¶ 19, 591 P.2d at 285 (concluding that "the legislative intent in enacting the [NMUAA], and the policy of the courts in enforcing it, is to reduce caseloads in the courts, not only by allowing arbitration, but also by requiring controversies to be resolved by arbitration where contracts or other documents so provide").  In New Mexico, when the court finds that an arbitration agreement exists and is valid, then, in accordance with the NMUAA, the court has a duty to enforce the agreement's provisions and order adherence to that arbitration agreement.  See Bernalillo Cty. Med. Ctr. Emps' Ass'n Local 2370 v. Cancelosi, 1978-NMSC-086, ¶¶ 4-5, 587 P.2d 960, 961.  Consistent with this understanding, the Supreme Court of New Mexico has interpreted the NMUAA to limit the court's role to determining if an arbitration agreement exists and, if so, to order the parties to arbitration:

> When a broad and general arbitration clause is used, as in this case, the court should be very reluctant to interpose itself between the parties and the arbitration upon which they have agreed.  When the parties agree to arbitrate any potential claims or disputes arising out of their relationships by contract or otherwise, the arbitration agreement will be given broad interpretation unless the parties themselves limit arbitration to specific areas or matters.  Barring such limiting language, the courts only decide the threshold question of whether there is an agreement to arbitrate. If so, the court should order arbitration.  If not, arbitration should be refused.

K.L. House Constr. Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d 752, 754. Accordingly, in New Mexico, parties entering a contract providing for the resolution of disputes through arbitration are bound by their agreement to arbitrate.  See; Evangelical Lutheran Good Samaritan Soc'y v. Moreno, 277 F. Supp. 3d at 1211; Christmas v. Cimarron Realty Co., 1982-NMSC-079, ¶¶ 7-10, 648 P.2d 788, 790.

3. **Public Policy Favoring Enforcement of an Arbitration Agreement.**

"There is a strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration." Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d at 1488-89. See Southland Corp. v. Keating, 465 U.S. 1, 10 (1984)("Congress declared a national policy favoring arbitration."); Hill v. Ricoh Americas Corp., 603 F.3d 766, 771 (10th Cir. 2010)("[T]he FAA is a 'congressional declaration of a liberal federal policy favoring arbitration agreements.'" (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24)). Congress enacted the FAA with the express purpose of granting arbitration agreements the same enforceability as any other contract provision. See Volt Info. Sciences, Inc. v. Bd. of Trs., 489 U.S. 468, 474 (1989)(stating that Congress designed the FAA to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and place such agreements upon the same footing as other contracts."). When arbitration's applicability is in dispute, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)(internal quotation marks omitted)(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24-25). New Mexico state courts also view arbitration as a "highly favored" method of resolving disputes, "in part because '[i]t promotes both judicial efficiency and conservation of resources by all parties.'" Piano v. Premier Distrib. Co.,[9] 2005-NMCA-018, ¶ 5,

_____

[9] The Court predicts that, if presented with the issue, the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's statements in Piano v. Premier Distrib. Co. and Santa Fe Techs. Inc. v. Argus Networks, Inc. that arbitration is New Mexico's favored method of resolving disputes because it promotes judicial efficiency and conservation of parties' resources. The Court bases its prediction on McMillan v. Allstate Indem. Co., 2004-NMSC-002,

107 P.3d 11, 13 (alteration in original)(quoting Santa Fe Techs. Inc. v. Argus Networks, Inc., 2002-NMCA-030, ¶ 51, 42 P.3d 1221). See Cornoyer v. AT&T Mobility Servs., LLC, 2016 WL 6404853, at *8.

### 4. A Valid Arbitration Agreement's Existence.

The Supreme Court has noted that "[a]rbitration is simply a matter of contract between parties; it is a way to resolve those disputes -- but only those disputes -- that the parties have agreed to submit to arbitration." First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995)( citations omitted). Courts must interpret arbitration clauses liberally, and all doubts must be resolved in favor of arbitration. See Hicks v. Cadle, Co., 355 F. App'x 186, 192 (10th Cir. 2009)(unpublished)[10]("We resolve any doubts in favor of arbitrability." (citing Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 209 (1991))); Armijo v. Prudential Ins., 72 F.3d 793, 797-98 (10th Cir. 1995)(stating that "questions of arbitrability must be addressed with a healthy regard

---

¶ 9, 84 P.3d 65, 69, in which the Supreme Court of New Mexico recognized "that in New Mexico there is a strong public-policy preference in favor of resolving disputes through arbitration . . . as a means of relieving congestion in the court system, speeding up resolution of disputes, and making the resolution of cases more economical to all parties." McMillan v. Allstate Indem. Co., 2004-NMSC-002, ¶ 9, 84 P.3d at 69.

[10]Hicks v. Cadle, Co. is an unpublished opinion, but the Court can rely on an unpublished opinion for the Tenth Circuit to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Hicks v. Cadle, Co., Pennington v. Northrop Grumman Space & Mission System Corp., and Jones v. United States have persuasive value with respect to material issues and will assist the Court in its disposition of this Memorandum Opinion and Order.

for the federal policy favoring arbitration," and that "arbitration clauses must be interpreted liberally, and any doubts should be resolved in favor of arbitration," and holding that the plaintiffs had "failed to rebut the presumption of arbitrability"). While "the presumption in favor of arbitration is properly applied in interpreting the scope of an arbitration agreement, . . . this presumption disappears when the parties dispute the existence of a valid arbitration agreement." Dumais v. Am. Golf Corp., 299 F.3d at 1220. See Riley Mfg. Co., Inc. v. Anchor Glass Container Corp., 157 F.3d 775, 779 (10th Cir. 1998)("When the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away."); Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 112 F. Supp. 3d, 1157, 1206 (D.N.M. 2015)(Browning, J.).

In the Tenth Circuit, and in the courts of New Mexico, the "existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." Avedon Eng'g Inc. v. Seatex, 126 F.3d 1279, 1287 (10th Cir. 1997). See K.L. House Constr. Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d at 754 ("[T]he courts only decide the threshold question of whether there is an agreement to arbitrate. If so, the court should order arbitration."). "Like other contracts . . . [arbitration agreements] may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 68 (quoting Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996)). See Cornoyer v. AT&T Mobility Servs., LLC, 2016 WL 6404853, at *8-11. Cf. K.L. House Construction Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 576 P.2d at 754 (holding that,

because a valid arbitration clause existed, the parties had to arbitrate all disputes when the "subject matter of the dispute has a reasonable relationship to the subject matter of the contract").

### 5. **Consideration and Illusory Arbitration Agreements.**

"To determine whether the agreement to arbitrate is valid, courts look to general state contract law, with the caveat that state laws that are specifically hostile to arbitration agreements are preempted by the FAA." Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 8, 90 P.3d at 469 (citations omitted). It is a fundamental tenet of contract law "that each party to a contract has a duty to read and familiarize himself with the contents of the contract, each party generally is presumed to know the terms of the agreement, and each is ordinarily bound thereby." Ballard v. Chavez, 1994-NMSC-007, ¶ 8, 868 P.2d 646, 648. Under New Mexico law, "[a] legally enforceable contract requires evidence supporting the existence of an offer, an acceptance, consideration, and mutual assent." Piano v. Premier Distrib. Co.,[11] 2005-NMCA-018, ¶ 6, 107 P.3d at 14 (internal quotation marks omitted)(quoting Heye v. Am. Golf Corp., Inc., 2003-NMCA-138, ¶ 9, 80 P.3d 495).

"Consideration consists of a promise to do something that a party is under no legal obligation to do or to forbear from doing something he has a legal right to do." Talbott v. Roswell Hosp. Corp., 2005-NMCA-109, ¶ 16, 118 P.3d 194, 198. "A valid contract must possess mutuality

---

[11]The Court predicts that the Supreme Court of New Mexico would agree with the statement of a legally-enforceable contract's requirements under New Mexico law in Piano v. Premier Distrib. Co. and Heye v. Am. Golf Corp., Inc., because the Supreme Court of New Mexico has stated the same proposition in Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 7, 857 P.2d 776, 780 ("Ordinarily, to be legally enforceable, a contract must be factually supported by an offer, an acceptance, consideration, and mutual assent.")

of obligation. Mutuality means both sides must provide consideration." Heye v. Am. Golf Corp., 2003-NMCA-138, ¶ 12, 80 P.3d 495, 499.[12] Absent evidence of a "bargained-for exchange between the parties," an agreement lacks consideration and is unenforceable. Smith v. Vill. of Ruidoso, 1999-NMCA-151, ¶ 33, 994 P.2d 50, 58.[13] "Under general New Mexico contract law, an agreement that is subject to unilateral modification or revocation is illusory and unenforceable." Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 9, 90 P.3d at 469. "This principle applies equally to agreements to arbitrate." Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 9, 90 P.3d at 469. The Supreme Court of New Mexico has concluded that, if a party "reserves the right to change the agreement unilaterally, and at any time," the party "has not really promised anything at all and should not be permitted to bind the other party." Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶ 9, 90 P.3d at 469.

Several cases arising in New Mexico provide examples of illusory agreements to arbitrate. For instance, in Dumais v. American Golf Corp., 150 F. Supp. 2d 1182 (D.N.M. 2001)(Vazquez, J.), aff'd, 299 F.2d 1216 (10th Cir. 2002), the Honorable Martha Vazquez, United States District Judge for the District of New Mexico, was asked to determine if an arbitration provision in an employment handbook was enforceable, and precluded an employee from bringing a claim for

---

[12]The Court is confident that the Supreme Court of New Mexico agrees with the Court of Appeals of New Mexico's assertion in Heye v. Am. Golf Corp., based on Vanzandt v. Heilman, in which the Supreme Court of New Mexico stated the same proposition. See 1950-NMSC-009, ¶ 11, 214 P.2d 864, 866.

[13]The Court is confident that the Supreme Court of New Mexico agrees with the Court of Appeals of New Mexico's assertion in Smith v. Vill. of Ruidoso, based on Romero v. Earl, 1991-NMSC-042, ¶ 6, 810 P.2d 808, 810, in which the Supreme Court of New Mexico stated the same.

sexual harassment and constructive discharge under Title VII against her employer.  See 150 F. Supp. 2d at 1193.  The employer suggested that two documents which the employee executed when she became an employee constituted a valid agreement to arbitrate such disputes.  See 150 F. Supp. 2d at 1193.  The documents included: (i) a form acknowledging that the employee had read and would abide by the employer's arbitration program -- the "We Can Work It Out" program; and (ii) an acknowledgment form that the employee would comply with the employment handbook and the "We Can Work It Out" program.  150 F. Supp. 2d at 1193.  Judge Vazquez concluded that the arbitration agreement embodied in the "We Can Work It Out" program was illusory, because it was executed over two months after the employee began her employment.  150 F. Supp. 2d at 1193.  The agreement also modified the employment terms -- it divested the employee's right to have disputes heard in an Article III court -- without consideration in return for that divestiture. See 150 F. Supp. 2d at 1193.  Judge Vazquez noted that inconsistent provisions in the employment agreement made it unclear whether the arbitration agreement was binding on the employer and that, therefore, the potentially unilateral character of the promise to arbitrate made it illusory. See 150 F. Supp. 2d at 1194.  The Tenth Circuit affirmed Judge Vazquez' holding in a de novo review on appeal.  See 299 F.3d at 1220.  In affirming Judge Vazquez, the Tenth Circuit stated: "We join other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory."  299 F.3d at 1219.

Additionally, in <u>Heye v. American Golf Corp.</u>,[14] the Court of Appeals of New Mexico considered a question like the one that the federal court addressed in <u>Dumais v. American Golf Corp.</u> <u>See</u> <u>Heye v. American Golf Corp.</u>, 2003-NMCA-138, ¶¶ 10-15, 80 P.3d at 499-500. The Court of Appeals of New Mexico assessed the validity of an arbitration agreement in an employment contract that bound the employee, but not the employer, to arbitrate and that the employee signed after she was hired. <u>See</u> 2003-NMCA-138, ¶¶ 10-15, 80 P.3d at 499-500. In concluding that the agreement was illusory, the Court of Appeals of New Mexico noted that the agreement permitted the employer to "amend, supplement, rescind or revise the policy regarding arbitration at its whim." 2003-NMCA-138, ¶ 13, 80 P.3d at 499. Although the employee was bound to arbitrate, the employer "remain[ed] free to selectively abide by its promise to arbitrate,"

---

[14]The Court predicts that, if presented with the issue, the Supreme Court of New Mexico would agree with the Court of Appeals' reasoning and decision in <u>Heye v. American Golf Corp.</u>, based on the Supreme Court of New Mexico's decision in <u>Salazar v. Citadel Commc'ns Corp.</u>, in which the Supreme Court of New Mexico stated that, under general New Mexico contract law, an agreement that is subject to unilateral modification or revocation is illusory and unenforceable." <u>Salazar v. Citadel Commc'ns Corp.</u>, 2004-NMSC-013, ¶ 9, 90 P.3d at 469. "This principle applies equally to agreements to arbitrate." <u>Salazar v. Citadel Commc'ns Corp.</u>, 2004-NMSC-013, ¶ 9, 90 P.3d at 469. The Supreme Court of New Mexico has concluded that, if a party "reserves the right to change the agreement unilaterally, and at any time," the party "has not really promised anything at all and should not be permitted to bind the other party." <u>Salazar v. Citadel Commc'ns Corp.</u>, 2004-NMSC-013, ¶ 9, 90 P.3d at 469. In <u>Heye v. American Golf Corp.</u>, the employer reserved the right to "amend, supplement, rescind or revise" the arbitration policy at its whim, 2003-NMCA-138, ¶ 13, 80 P.3d at 499, and, accordingly, "has not really promised anything at all," 2004-NMSC-013, ¶ 9, 90 P.3d at 469. The Supreme Court of New Mexico, on these facts, would likely agree with the Court of Appeals of New Mexico's decision to find such an agreement illusory.

and therefore the employer's "promise to arbitrate [did] not provide the consideration necessary to enforce the arbitration agreement." 2003-NMCA-138, ¶ 15, 80 P.3d at 500.

Next, in Piano v. Premier Distributing Co.,[15] the plaintiff worked as an administrative assistant for the defendant on an at-will employment basis. See 2005-NMCA-018, ¶¶ 2-3, 107 P.3d at 13. During her employment, the defendant presented the plaintiff with an arbitration agreement to sign, with the understanding that, if she did not sign it, the defendant would terminate her employment. See 2005-NMCA-018, ¶¶ 2-3, 107 P.3d at 13. The plaintiff signed the agreement, and, later, when her employment was terminated, she sued the defendant for wrongful termination; the defendant moved to compel arbitration. See 2005-NMCA-018, ¶¶ 2-3, 107 P.3d at 13. On appeal of the district court's denial of the defendant's motion to compel arbitration, the Court of Appeals of New Mexico addressed whether an employer's promise of continued at-will employment constitutes enough consideration for an employee's promise to submit her claims to arbitration. See 2005-NMCA-018, ¶¶ 6-8, 107 P.3d at 14. The Court of Appeals of New Mexico concluded that the employer's promise was illusory and explained: "The implied promise of continued at-will employment placed no constraints on Defendant's future conduct; its decision to continue Plaintiff's at-will employment was entirely discretionary." 2005-NMCA-018, ¶ 8, 107 P.3d at 14.

_____

[15]For the reasons stated supra, n.14, the Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with the Court of Appeals of New Mexico's reasoning and decision in Piano v. Premier Distributing Co. and find the agreement illusory.

In <u>Lumuenemo v. Citigroup, Inc.</u>, No. 08-cv-0830, 2009 WL 371901 (D. Colo. Feb. 12, 2009), the Honorable Wiley Y. Daniel, Chief United States District Judge for the District of Colorado, distinguished the facts in <u>Piano v. Premier Distributing Co.</u> from the facts in <u>Lumuenemo v. Citigroup, Inc.</u>, stating:

> Plaintiff cites <u>Piano v. Premier Distributing Co.</u>, 107 P.3d 11 (N.M. Ct. App. 2004), as support for her argument. However, the holding in <u>Piano</u> turned on the fact that the plaintiff was an at-will employee prior to signing the arbitration agreement, and therefore, the implied promise of continued at-will employment did not constitute consideration. <u>Id.</u> at 60. <u>Piano</u> is distinguishable from the facts before this Court. Here, Defendant's initial hiring of Plaintiff was conditioned on her consent to the terms of the Arbitration Agreement; thus, there was consideration in the form of employment. Further, Defendant does need Plaintiff's approval -- Plaintiff had up to 30 days to contest any changes to the Arbitration Agreement and/or to decide whether to continue employment based on such changes. Moreover, the holding in <u>Piano</u> is not binding on this court.

<u>Lumuenemo v. Citigroup, Inc.</u>, 2009 WL 371901, at *5.

Further, in <u>Salazar v. Citadel Communications Corp.</u>, the Supreme Court of New Mexico held that, because Citadel Communications reserved the right to modify any provision of its employee handbook at any time, including the arbitration agreement contained therein, the agreement to arbitrate was "an unenforceable illusory promise." <u>Salazar v. Citadel Commc'n Corp.</u>, 2004-NMSC-013, ¶ 16, 90 P.3d at 471. In contrast, the Court of Appeals of New Mexico in <u>Sisneros v. Citadel Broadcasting Co.</u> concluded that the arbitration policy at issue restricted Citadel Broadcasting's right to terminate or amend the agreement to arbitrate, and, thus, when Citadel Broadcasting terminated Sisneros' employment, Citadel Broadcasting was bound to arbitrate the dispute, just as Sisneros was bound to arbitrate, and therefore mutual obligation existed and the arbitration agreement was not illusory. <u>See</u> <u>Sisneros v. Citadel Broad. Co.</u>, 2006-

NMCA-102, ¶ 34, 142 P.3d at 43.  Similarly, in <u>Hardin v. First Cash Financial Services, Inc.</u>, 465 F.3d 470 (10th Cir. 2006), the arbitration agreement required the employer to provide ten-days' notice to its current employees before amending or terminating the arbitration agreement, and provided that the employer could not amend the agreement if it had actual notice of a potential dispute or claim, nor could it terminate the agreement as to any claims which arose before the termination date.  <u>See</u> 465 F.3d at 478.  The Tenth Circuit, applying Oklahoma contract law, concluded that "[t]he . . . limitations [were] sufficient to avoid rendering the parties' Agreement to arbitrate illusory."  <u>Hardin v. First Cash Fin. Servs., Inc.</u>, 465 F.3d at 478.  <u>See</u> <u>Pennington v. Northrop Grumman Space & Mission Sys. Corp.</u>, 269 F. App'x 812, 820 (10th Cir. 2008)(unpublished)(holding that "the reciprocal obligation to arbitrate provides the requisite consideration."); <u>Cornoyer v. AT&T Mobility Servs., LLC</u>, 2016 WL 6404853, at *8.

In <u>Laurich v. Red Lobster Restaurants, LLC</u>, 295 F. Supp. 3d 1186 (D.N.M. 2017)(Browning, J.), the Court concluded that the arbitration agreement at issue was not illusory where the employee provided consideration by agreeing to arbitrate certain claims outside of a courtroom and to work for the employer, and the employer provided consideration by also agreeing to arbitrate certain claims outside of a courtroom and to employ the employee, and where neither party was under any legal obligation to do these things.  <u>See</u> 295 F. Supp. 3d at 1216-17.

**NEW MEXICO LAW ON CONTRACT INTERPRETATION
<u>AND EXTRINSIC EVIDENCE</u>**

In contract cases, "the role of the court is to give effect to the intention of the contracting parties."  <u>Bogle Farms, Inc. v. Baca</u>, 1996-NMSC-051, ¶ 21, 925 P.2d 1184, 1190.  "The primary

objective in construing a contract is not to label it with specific definitions or to look at form above substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, , 925 P.2d at 1190 (citing Shaeffer v. Kelton, 1980-NMSC-117, ¶ 8, 619 P.2d 1226, 1229). In C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 12, 817 P.2d 238, 242, the Supreme Court of New Mexico abolished the four-corners standard of contract interpretation, which required a court to determine whether a contract was ambiguous without considering evidence of the circumstances surrounding the contract's negotiation. The Supreme Court of New Mexico held that, "in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." 1991-NMSC-070, ¶ 12, 817 P.2d at 242-43 (footnote omitted). The Supreme Court of New Mexico went on to discuss the parol-evidence rule:

> The parol evidence rule is a rule of substantive law that bars admission of evidence extrinsic to the contract to contradict and perhaps even to supplement the writing. . . . The rule should not bar introduction of evidence to explain terms. As Professor Corbin observes, "No parol evidence that is offered can be said to vary or contradict a writing until by process of interpretation the meaning of the writing is determined." [A.] Corbin, The Parol Evidence Rule, 53 Yale L.J. 603, 622 (1944). The operative question then becomes whether the evidence is offered to contradict the writing or to aid in its interpretation.

C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 16, 817 P.2d at 243 (footnote omitted).

The question whether an agreement contains an ambiguity is a matter of law. See Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d 1232, 1235 ("Mark V")(citing Levenson v.

Mobley, 1987-NMSC-102, ¶ 7, 744 P.2d 174, 176). In Mark V, the Supreme Court of New Mexico made it clear that when a term or expression in an agreement is unclear, consideration of extrinsic evidence was not only allowed, but required. See 1993-NMSC-001, ¶ 12, 845 P.2d at 1235 (holding that court committed error when it "relied solely on the face or the 'four corners' of the document"). See also Schultz & Lindsay Const. Co., 1972-NMSC-013, ¶ 6, 494 P.2d 612, 614. The Supreme Court of New Mexico summarized the law of contract interpretation in New Mexico as follows:

> The court may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear. C.R. Anthony, 112 N.M. at 508-09, 817 P.2d at 242-43. If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law. Id. at 510, 817 P.2d at 244. If the court determines that the contract is reasonably and susceptible of different constructions, an ambiguity exists. Vickers v. North Am. Land Dev., Inc., 94 N.M. 65, 68, 607 P.2d 603, 606 (1980). At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder . . . .

Mark V, 1993-NMSC-001, ¶ 12, 845 P.2d at 1235.

## LAW REGARDING NEW MEXICO'S UNCONSCIONABILITY DEFENSE TO CONTRACT ENFORCEMENT

In New Mexico, "unconscionability is an affirmative defense to contract enforcement." Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶ 3, 304 P.3d 409, 412. Consequently, "[c]ourts may render a contract or portions of a contract unenforceable under the equitable doctrine of unconscionability when the terms are 'unreasonably favorable to one party while precluding a meaningful choice of the other party.'" Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 6, 385 P.3d 619, 621 (quoting Cordova v. World Fin. Corp. of N.M.,

2009-NMSC-021, ¶ 21, 208 P.3d 901, 907).  The party asserting an unconscionability defense "bears the burden of proving that a contract or a portion of a contract should be voided as unconscionable."  Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 7, 385 P.3d at 621 (citing Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶¶ 24, 39, 48, 304 P.3d 415).  "The burden of proving unconscionability refers only to 'the burden of persuasion, i.e., the burden to persuade the factfinder' and not 'the burden of production, i.e., the burden to produce evidence.'"  Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 7, 385 P.3d at 621 (quoting Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶ 24, 304 P.3d at 415).

"A contract can be procedurally or substantively unconscionable."  Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 7, 385 P.3d at 621 (citing Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 21, 208 P.3d at 907).  See Fiser v. Dell Comput. Corp., 2008-NMSC-046, ¶ 20, 188 P.3d 1215, 1221 ("The classic articulation of unconscionability is that it is comprised of two prongs: substantive unconscionability and procedural unconscionability." (citing 7 Joseph M. Perillo, Corbin on Contracts § 29.4, at 388 (2002 ed.))).  "Substantive unconscionability relates to the content of the contract terms and whether they are illegal, contrary to public policy, or grossly unfair."  Fiser v. Dell Comput. Corp., 2008-NMSC-046, ¶ 20, 188 P.3d at 1221 (citing Padilla, 2003-NMSC-011, ¶ 14, 68 P.3d 901, 907; Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d 675, 679, disapproved of on other grounds by Cordova, 2009-NMSC-021, ¶ 31, 208 P.3d at 909).  "Procedural unconscionability," by contrast, "is determined by analyzing the circumstances surrounding the contract's formation, such as whether it was an

adhesive contract and the relative bargaining power of the parties." Fiser v. Dell Comput. Corp., 2008-NMSC-046, ¶ 20, 188 P.3d at 1221 (citing Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679).

"The weight given to procedural and substantive considerations varies with the circumstances of each case." Fiser v. Dell Comput. Corp., 2008-NMSC-046, ¶ 20, 188 P.3d at 1221 (quotation marks omitted)(quoting Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679). "While there is a greater likelihood of a contract's being invalidated for unconscionability if there is a combination of both procedural and substantive unconscionability, there is no absolute requirement in our law that both must be present to the same degree or that they both be present at all." Cordova, 2009-NMSC-021, ¶ 24, 208 P.3d at 908 (citing Fiser v. Dell Comput. Corp., 2008-NMSC-046, ¶ 22, 188 P.3d at 1221 (invalidating an arbitration clause without a finding of procedural unconscionability where "there has been such an overwhelming showing of substantive unconscionability")); Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679; 7 Joseph M. Perillo, Corbin on Contracts § 29.1, at 377 (ed. 2002)(observing that there is "no basis in the text" of Article 2 of the Uniform Commercial Code for concluding that the defense of unconscionability cannot be invoked unless the contract or clause is both procedurally and substantively unconscionable)). Moreover, "[p]rocedural and substantive unconscionability often have an inverse relationship. The more substantively oppressive a contract term, the less procedural unconscionability may be required for a court to conclude that the offending term is unenforceable." Cordova, 2009-NMSC-021, ¶ 24, 208 P.3d at 908 (citing Circuit City Stores, Inc. v. Mantor, 335 F.3d 1101, 1106 (9th Cir. 2003); 1 E. Allan Farnsworth,

Farnsworth on Contracts § 4.28, at 585 (3d ed. 2004)("A court will weigh all elements of both substantive and procedural unconscionability and may conclude that the contract is unconscionable because of the overall imbalance.")).  See Laurich v. Red Lobster Rests., LLC, 295 F. Supp. 3d at 1211.

## 1.     **Procedural Unconscionability.**

"Procedural unconscionability may be found where there was inequality in the contract formation."  State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d 658, 669 (citing Cordova, 2009-NMSC-021, ¶ 23, 208 P.3d at 907-08).   A contract is procedurally unconscionable "only where the inequality is so gross that one party's choice is effectively non-existent."  Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 18, 709 P.2d at 679.  Whether a party has meaningful choice is "determined by examining the circumstances surrounding the contract formation . . . , including the particular party's ability to understand the terms of the contract and the relative bargaining power of the parties."  Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679 (citations omitted).   Consequently, "[a]nalyzing procedural unconscionability requires the court to look beyond the four corners of the contract and examine factors 'including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other.'"  State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669 (quoting Cordova, 2009-NMSC-021, ¶ 27, 208 P.3d at 907-08).  See City of Raton v. Ark. River Power Auth., 760 F. Supp. 2d 1132, 1154 (D.N.M. 2009)(Browning, J.)("In analyzing whether a contract or a term in a contract is procedurally unconscionable, New Mexico courts consider several factors, including the use of high pressure

tactics, the relative scarcity of the subject matter of the contract, and the relative education, sophistication and wealth of the parties." (citing Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 709 P.2d at 679)).

"When assessing procedural unconscionability, courts should consider whether the contract is one of adhesion." Rivera, 2011-NMSC-033, ¶ 44, 259 P.3d 803, 817. An adhesion contract is a standardized contract that a transacting party with superior bargaining strength offers to a "weaker party on a take-it-or-leave-it basis, without opportunity for bargaining." Rivera, 2011-NMSC-033, ¶ 44, 259 P.3d at 817 (citing Cordova, 2009-NMSC-021, ¶ 33, 208 P.3d at 910). "Adhesion contracts generally warrant heightened judicial scrutiny because the drafting party is in a superior bargaining position." Rivera, 2011-NMSC-033, ¶ 44, 259 P.3d at 817 (citing Wis. Auto Title Loans, Inc. v. Jones, 714 N.W.2d 155, 170 (Wis. 2006)). "Although not all adhesion contracts are unconscionable, an adhesion contract is procedurally unconscionable and unenforceable 'when the terms are patently unfair to the weaker party.'" Rivera, 2011-NMSC-033, ¶ 44, 259 P.3d at 817 (quoting Cordova, 2009-NMSC-021, ¶ 33, 208 P.3d at 910).

For example, in State ex rel. King v. B & B Investment Group, Inc., the Supreme Court of New Mexico decided whether loan contracts offered by certain small-loan lenders were unconscionable. See 2014-NMSC-024, ¶ 27, 329 P.3d at 669-70. The Supreme Court of New Mexico concluded that substantial evidence supported "the finding of procedural unconscionability as understood in common law." 2014-NMSC-024, ¶ 27, 329 P.3d at 669-70. The Supreme Court of New Mexico predicated its holding that the loan contracts at issue were procedurally unconscionable on several facts regarding contract formation, including

the relative bargaining strength and sophistication of the parties is unequal. Moreover, borrowers are presented with Hobson's choice: either accept the quadruple-digit interest rates, or walk away from the loan. The substantive terms are preprinted on a standard form, which is entirely nonnegotiable. The interest rates are set by drop-down menus in a computer program that precludes any modification of the offered rate. Employees are forbidden from manually overriding the computer to make fee adjustments without written permission from the companies' owners: manual overrides will be considered in violation of company policy and could result with . . . criminal charges brought against the employee and or termination.

2014-NMSC-024, ¶ 27, 329 P.3d at 669 (internal quotation marks omitted). The Supreme Court of New Mexico further concluded that, on these facts, the loan contracts at issue were contracts of adhesion, because the "contracts are prepared entirely by Defendants, who have superior bargaining power, and are offered to the weaker party on a take-it-or-leave-it basis." 2014-NMSC-024, ¶ 27, 329 P.3d at 669. The Supreme Court of New Mexico added that, "although they will not be found unconscionable in every case, an adhesion contract is procedurally unconscionable and unenforceable when the terms are patently unfair to the weaker party." 2014-NMSC-024, ¶ 27, 329 P.3d at 669 (citing Rivera , 2011-NMSC-033, ¶ 44, 259 P.3d at 817). See La Frontera Ctr., Inc. v. United Behavioral Health, Inc., 268 F. Supp. 3d 1167, 1204 (D.N.M. 2017)(Browning, J.).

**2.      Substantive Unconscionability.**

Substantive unconscionability requires courts "to consider 'whether the contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar public policy concerns'" to determine "the legality and fairness of the contract terms themselves." Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 8, 385 P.3d at 621 (quotation marks omitted)(quoting Cordova, 2009-NMSC-021, ¶ 22, 208 P.3d at 907).

Accordingly, when examining a contract for substantive unconscionability, courts must "examine the terms on the face of the contract and . . . consider the practical consequences of those terms." Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 8, 385 P.3d at 621 (citing State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 32, 329 P.3d at 670 ("[S]ubstantive unconscionability can be found by examining the contract terms on their face.")). "Thus, the party bearing the burden of proving substantive unconscionability need not make any particular evidentiary showing and can instead persuade the factfinder that the terms of a contract are substantively unconscionable by analyzing the contract on its face." Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 8, 385 P.3d at 622.

"When its terms are unreasonably favorable to one party, a contract may be held to be substantively unconscionable." Monette v. Tinsley, 1999-NMCA-040, ¶ 19, 975 P.2d 361, 365 (citing State ex rel. State Highway Transp. Dep't v. Garley, 1991-NMSC-008, ¶ 30, 806 P.2d 32, 39; Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 23, 709 P.2d 675, 680). The Supreme Court of New Mexico noted in Guthmann v. La Vida Llena:

> In determining reasonableness or fairness, the primary concern must be with the terms of the contract considered in light of the circumstances existing when the contract was made. The test is not simple, nor can it be mechanically applied. The terms are to be considered "in the light of the general commercial background and the commercial needs of the particular trade or case." Corbin suggests the test as being whether the terms are "so extreme as to appear unconscionable according to the mores and business practices of the time and place."

Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 23, 709 P.2d at 680 (quoting Bowlin's, Inc. v. Ramsey Oil Co., 1983-NMCA-038, ¶ 22, 662 P.2d 661, 669). Further, for a court to hold that a contract is substantively unconscionable, the court must conclude that one or more of the contract's

terms was grossly unfair "at the time the contract was formed." Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 24, 709 P.2d at 680.

With respect to arbitration agreements specifically, the Supreme Court of New Mexico has held that arbitration agreements are substantively unconscionable and thus unenforceable where the arbitration agreement contains a unilateral carve-out that explicitly exempts from mandatory arbitration those judicial remedies that a lender is likely to need, while providing no such exemption for the borrower. See Rivera, 2011-NMSC-033, ¶¶ 51-54, 259 P.3d at 818-19; Cordova v, 2009-NMSC-021, ¶ 32, 208 P.3d at 907-10. In Cordova, for example, the Supreme Court of New Mexico stated that "[c]ontract provisions that unreasonably benefit one party over another are substantively unconscionable." 2009-NMSC-021, ¶ 25, 208 P.3d at 908. In that case, a loan contract included a purportedly bilateral arbitration clause containing a unilateral carve-out provision that exempted the lender from mandatory arbitration when the lender sought remedies, "including[,] but not limited to, judicial foreclosure or repossession" in the event of the borrower's default. 2009-NMSC-021, ¶ 3, 208 P.3d at 904 (internal quotation marks omitted). The Supreme Court of New Mexico held that the arbitration clause was "grossly unreasonable" and against New Mexico public policy, because the agreement required the borrower to arbitrate any of the borrower's claims while reserving to the lender "the exclusive option of seeking its preferred remedies through litigation." 2009-NMSC-021, ¶ 20, 208 P.3d at 907. Accordingly, the Supreme Court of New Mexico held that the arbitration agreement was substantively unconscionable. See 2009-NMSC-021, ¶ 32, 208 P.3d at 910.

Next, in Rivera, the Supreme Court of New Mexico confronted a similar loan contract in which an arbitration agreement required the borrower to arbitrate any claims against the lender while exempting from mandatory arbitration the lender's "self-help or judicial remedies" concerning the property securing the transaction and any claims that the lender might have "[i]n the event of a default." 2011-NMSC-033, ¶ 3, 259 P.3d at 807-08. As in Cordova, 2009-NMSC-021, ¶ 32, 208 P.3d at 910, in Rivera, the Supreme Court of New Mexico again held the arbitration agreement substantively unconscionable, because the arbitration clause allowed the lender to "retain . . . the right to obtain through the judicial system the only remedies it [is] likely to need," while "forcing [the borrower] to arbitrate any claim she may have." 2011-NMSC-033, ¶ 53, 259 P.3d at 818-19. Accordingly, the Supreme Court of New Mexico held that the arbitration agreement was unreasonably one-sided and, therefore, unenforceable qua substantively unconscionable. See 2011-NMSC-033, ¶ 54, 259 P.3d at 818-19.

By contrast, in Dalton v. Santander Consumer USA, Inc., the Supreme Court of New Mexico held that an arbitration agreement between a lender and a borrower which included a bilateral exception for small claims less than $10,000.00 was not substantively unconscionable, "even if one party is substantively more likely to bring small claims actions." 2016-NMSC-035, ¶ 21, 385 P.3d at 624. See 2016-NMSC-035 ¶ 22, 385 P.3d at 625 ("We are hesitant to adopt a holding that might discourage bilateral small claims carve-outs, and thereby curtail the availability of small claims proceedings to New Mexico consumers . . . ."). The Supreme Court of New Mexico stated that "[g]ross unfairness is a bedrock principle of our unconscionability analysis," 2016-NMSC-035, ¶ 21, 385 P.3d at 624, and refused to conclude that an arbitration agreement that

exempts, for both parties, claims less than $10,000.00 from mandatory arbitration is either unreasonably one-sided or grossly unfair, see 2016-NMSC-035, ¶¶ 21-25, 385 P.3d at 624-25. See Thompson v. THI of New Mexico at Casa Arena Blanca, LLC, 2006 WL 4061187, at *10.

The Supreme Court of the United States has also held that state courts may not use unconscionability to subvert the FAA's purposes. See AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 341 (2011)(Scalia, J.)("Concepcion"). To be sure, the FAA says that arbitration agreements may be rendered unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "But the inquiry becomes more complex when a doctrine normally thought to be generally applicable, such as . . . unconscionability, is alleged to have been applied in a fashion that disfavors arbitration." Concepcion, 563 U.S. at 341. "The FAA's preemptive effect might extend even to grounds traditionally thought to exist 'at law or in equity for the revocation of any contract.'" Concepcion, 563 U.S. at 341 (quoting 9 U.S.C. § 2). "Although § 2's saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." Concepcion, 563 U.S. at 343. "A federal statute's saving clause 'cannot in reason be construed as [allowing] a common law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself.'" Concepcion, 563 U.S. at 343 (quoting Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc., 524 U.S. 214, 227-28 (1998)).

The Tenth Circuit has held that the FAA "limits state-law grounds for refusing to enforce an arbitration clause." Walker v. BuildDirect.com Techs., Inc., 733 F.3d 1001, 1004 (10th Cir.

2013). "In particular, states 'may not . . . decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause.'" <u>Walker v. BuildDirect.com Techs., Inc.</u>, 733 F.3d at 1005 (quoting <u>Allied-Bruce Terminix Cos., Inc. v. Dobson</u>, 513 U.S. at 281). <u>See</u> <u>Parrish v. Valero Retail Holdings, Inc.</u>, 727 F. Supp. 2d 1266, 1279 ("[T]he Court believes that such hostility to arbitration in employment contracts may begin to infringe the FAA's intent to protect against judicial hostility towards arbitration."). The Court therefore must ensure that state courts are not using contract defenses such as unconscionability to destroy the FAA. <u>See</u> <u>Jerry Erwin Assocs., Inc. v. Estate of Asher by & through Zangara</u>, 290 F. Supp. 3d at 1244. <u>See also</u> Wallace Mendelson, <u>The Judge's Art</u>, 109 U. Pa. L. Rev. 524, 533 (1961)("Even Plato recognized that a philosopher king would be unacceptable unless he could hide his naked power by a 'noble fiction.' It follows, of course, that platonists on the bench do not avow, but only practice, activism.").

## LAW REGARDING CERTIFICATION TO<br>THE SUPREME COURT OF NEW MEXICO

N.M.R.A.-Civ. Rule 12-607 provides:

A. Power to answer.

(1) The Supreme Court may answer by formal written opinion questions of law certified to it by a court of the United States, an appellate court of another state, a tribe, Canada, a Canadian province or territory, Mexico or a Mexican state if the answer may be determinative of an issue in pending litigation in the certifying court and the question is one for which answer is not provided by a controlling:

      (a) appellate opinion of the New Mexico Supreme Court or the New Mexico Court of Appeals; or

      (b) constitutional provision or statute of this state.

N.M.R.A.-Civ. § 12-607(A)(1).  See, e.g., Walker v. United States, 2007-NMSC-038, ¶ 1, 162

P.3d 882 (answering questions that the United States Court of Federal Claims certified); Campos

v. Murray, 2006-NMSC-020, ¶ 2, 134 P.3d 741 (answering questions that the Honorable Bruce D.

Black, United States District Judge for the District of New Mexico, certified).  Federal courts have

the option of determining what a state court would do if confronted with the same issue, see Erie

R.R. v. Tompkins, 304 U.S. 64, 78 (1938), or of certifying the question to the state appellate court

for review, see Allstate v. Stone, 1993-NMSC-066, ¶ 1, 863 P.2d 1085, 1086 ("This matter comes

before us by way of certification from the United States District Court for the District of New

Mexico . . . .").  See Lehman Bros. v. Schein, 416 U.S. 386, 390-91 (1974)(stating that the decision

to certify a question to the state supreme court "rests in the sound discretion of the federal court").

Pursuant to N.M. Stat. Ann. § 39-7-4, the Supreme Court of New Mexico may answer questions

that the federal district court certifies to it if they involve propositions of New Mexico law that

may be determinative of the matter before the certifying court and there are no controlling

precedents from the New Mexico appellate court.  See Swink v. Fingado, 1993-NMSC-013, ¶ 1

n.1, 850 P.2d 978, 979 n.1; Schlieter v. Carlos, 1989-NMSC-037, ¶ 2, 775 P.2d 709, 710.

The Supreme Court of New Mexico may answer questions that the federal district court

certifies to it only "'if the answer may be determinative of an issue in pending litigation in the

certifying court and there is no controlling appellate decision, constitutional provision or statute of

this state.'"  Arnold v. Farmers Ins. of Ariz., 827 F. Supp. 2d 1289, 1294 (D.N.M. 2011)(Browning,

J.)(quoting N.M. Stat. Ann. § 39-7-4).  See N.M.R.A.-Civ. 12-607(A).  In explaining when it will

accept certification from a federal court, the Supreme Court of New Mexico has noted:

> To date, we by and large have limited our acceptance of certifications prior to judgment to those cases in which there is no dispute over the factual predicates to the Court's determination of the questions certified, and our answer either disposes of the entire case or controversy, or disposes of a pivotal issue that defines the future course of the case.

Schlieter v. Carlos, 1989-NMSC-037, ¶ 5, 775 P.2d 709, 710-11 (citations omitted). The Honorable Barbara Smith Evans, United States Magistrate Judge for the District of New Mexico has stated that litigation is not pending under this statute when the district court "has already ruled upon the issue for which [the party] seek[s] certification." Hartford Ins. of the Midwest v. Cline, 367 F. Supp. 2d 1342, 1344 (D.N.M. 2005)(Smith, M.J.).

In Stoner v. New York Life Insurance Co., 311 U.S. 464 (1940), the Supreme Court of the United States explained that, "in cases where jurisdiction rests on diversity of citizenship, federal courts, under the doctrine of Erie Railroad Co. v. Tompkins . . . must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently." 311 U.S. at 467. "In particular, this is true where the intermediate state court has determined the precise question in issue in an earlier suit between the same parties, and the highest court of the state has refused review." Stoner v. N.Y. Life Ins., 311 U.S. at 467. See Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins., 891 F.2d 772, 774 (10th Cir. 1989)("With respect to issues which the Colorado Supreme Court has not addressed, we may consider all available resources, including Colorado appellate court decisions, other state and federal decisions, and the general trend of authority, to determine how the Colorado Supreme Court would construe the law in this case."). As the Tenth Circuit explained in Wade v. Emcasco Ins., 483 F.3d 657 (10th Cir. 2007):

> In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law. The federal court must follow the most recent decisions of the state's highest court. Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law. Ultimately, however, the Court's task is to predict what the state supreme court would do. Our review of the district court's interpretation of state law is de novo.

483 F.3d at 665-66 (citations and internal quotation marks omitted).

The Tenth Circuit "generally will not certify questions to a state supreme court when the requesting party seeks certification only after having received an adverse decision from the district court." Massengale v. Okla. Bd. of Exam'rs in Optometry, 30 F.3d 1325, 1331 (10th Cir. 1994). See Armijo v. Ex Cam, Inc., 843 F.2d 406, 407 (10th Cir.1988)(noting that "[c]ertification is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law," and that "the plaintiff did not request certification until after the district court made a decision unfavorable to her"); Boyd Rosene & Assoc., Inc. v. Kan. Mun. Gas Agency, 178 F.3d 1363, 1364 (10th Cir. 1999)("Late requests for certification are rarely granted by this court and are generally disapproved, particularly when the district court has already ruled."); Harvey E. Yates Co. v. Powell, 98 F.3d 1222, 1229 n.6 (10th Cir. 1996)(denying request for certification in removed case where the moving party had not moved for certification in the district court and had received an adverse ruling).

## LAW REGARDING MOTIONS TO RECONSIDER

Except where the Federal Rules of Civil Procedure specify, motions to reconsider fall into three categories:

> (i) a motion to reconsider filed within [twenty-eight] days of the entry of judgment is treated as a motion to alter or amend the judgment under rule 59(e); (ii) a motion to reconsider filed more than [twenty-eight] days after judgment is considered a motion for relief from judgment under rule 60(b); and (iii) a motion to reconsider any order that is not final is a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion. See Price v. Philpot, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005).

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.). See Price v. Philpot, 420 F.3d at 1167; Computerized Thermal Imaging, Inc. v. Bloomberg. L.P., 312 F.3d 1292, 1296 (10th Cir. 2002).

### 1.    Motions for Reconsideration Under Rules 59(e) and 60(b).

Courts may treat motions for reconsideration as a rule 59(e) motion when the movant files within twenty-eight days of a court's entry of judgment. See Price v. Philpot, 420 F.3d at 1167 n.9. If the movant files outside that time period, courts should treat the motion as seeking relief from judgment under rule 60(b). See Price v. Philpot, 420 F.3d at 1167 n.9. "[A] motion for reconsideration of the district court's judgment, filed within [rule 59's filing deadline], postpones the notice of appeal's effect until the motion is resolved." Jones v. United States, 355 F. App'x 117, 121 (10th Cir. 2009)(unpublished). The time limit in rule 59(e) is now twenty-eight days from the entry of a judgment. See Fed. R. Civ. P. 59(e).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule

60 of the Federal Rules of Civil Procedure is not only a question of timing, but also "depends on the reasons expressed by the movant." Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d 1194, 1200 (10th Cir. 2011). Where the motion "involves 'reconsideration of matters properly encompassed in a decision on the merits,'" a court considers the motion under rule 59(e). Phelps v. Hamilton, 122 F.3d 1309, 1323-24 (10th Cir. 1997)(quoting Martinez v. Sullivan, 874 F.2d 751, 753 (10th Cir. 1989)). In other words, if the reconsideration motion seeks to alter the district court's substantive ruling, then it should be considered a rule 59 motion and be subject to rule 59's constraints. Phelps v. Hamilton, 122 F.3d at 1324. In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal representatives from a final judgment, order, or proceeding for the following reasons:
>
> (1)     mistake, inadvertence, surprise, or excusable neglect;
>
> (2)     newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3)     fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4)     the judgment is void;
>
> (5)     the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6)     any other reason that justifies relief.

Fed. R. Civ. P. 60(b). Neither a rule 59 nor a rule 60 motion for reconsideration

are appropriate vehicles to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion. . . . Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.

Servants of the Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000). "[A] motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." Servants of the Paraclete v. Does, 204 F.3d at 1012. A district court has considerable discretion in ruling on a motion to reconsider. See Phelps v. Hamilton, 122 F.3d at 1324.

Rule 60 authorizes a district court to, "[o]n motion and just terms[,] . . . relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons," including "any other reason that justifies relief." Fed. R. Civ. P. 60(b). A court cannot enlarge the time for filing a rule 59(e) motion. See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 347 (10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions); Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. CIV 11-0103 JB/WPL, 2012 WL 869000, at *2 (D.N.M. March 8, 2012)(Browning, J.)("The Court may not extend the time period for timely filing motions under Rule 59(e) . . . ."). "A motion under rule 59 that is filed more than 28 days after entry of judgment may be treated as a Rule 60(b) motion for relief from judgment." 12 James Wm. Moore et al., Moore's Federal Practice § 59.11[4][b], at 59-32 (3d ed. 2012)(citations omitted). Nevertheless, a court will not generally treat an untimely rule 59(e) motion as a rule 60(b) motion when the party is seeking "'reconsideration of matters properly

encompassed in a decision on the merits' contemplated by Rule 59(e)." <u>Jennings v. Rivers</u>, 394 F.3d 850, 854 (10th Cir. 2005)(quoting <u>Osterneck v. Ernst & Whinney, 489 U.S. 169, 174 (1989)</u>).

Under some circumstances, parties can rely on rule 60(b)(1) for a mistake by their attorney or when their attorney acted without their authority. <u>See</u> <u>Yapp v. Excel Corp.</u>, 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to provide relief to a party . . . when the party has made an excusable litigation mistake or an attorney has acted without authority . . . ."). Mistake in this context entails either acting without the client's consent or making a litigation mistake, such as failing to file or to comply with deadlines. <u>See</u> <u>Yapp v. Excel Corp.</u>, 186 F.3d at 1231. If the alleged incident entails a mistake, then it must be excusable, meaning that the party was not at fault. <u>See</u> <u>Pioneer Inv. Servs. v. Brunswick Assocs. LP</u>, 507 U.S. 380, 394 (1993); <u>Cashner v. Freedom Stores, Inc.</u>, 98 F.3d 572, 577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision by the party."); <u>Pelican Prod. Corp. v. Marino</u>, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding that attorney carelessness is not a basis for relief under Rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result of an attorney's deliberate litigation tactics. <u>See</u> <u>Cashner v. Freedom Stores, Inc.</u>, 98 F.3d at 577. This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer agent and

is considered to have notice of all facts, notice of which can be charged upon the attorney.

Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. at 397 (internal quotation marks omitted)(quoting Link v. Wabash R.R., 370 U.S. 626, 633-34 (1962)).  The Tenth Circuit has held that there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct," and has noted that those "who act through agents are customarily bound," even though, when "an attorney is poorly prepared to cross-examine an expert witness, the client suffers the consequences."  Gripe v. City of Enid, Okla., 312 F.3d 1184, 1189 (10th Cir. 2002).

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case." Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991)(internal quotation marks omitted)(quoting Pierce v. Cook & Co., 518 F.2d 720, 722 (10th Cir. 1975)(en banc)).  "If the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)."  Moore, supra § 60.48[2], at 60-182.  Accord Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive.").  "The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' while also cautioning that it should only be applied in 'extraordinary circumstances.'"  Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863.

Generally, the situation must be one beyond the control of the party requesting relief under rule 60(b)(6) to warrant relief. See Ackermann v. United States, 340 U.S. 193, 202 (1950)("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence. Subsection 6 of Rule 60(b) has no application to the situation of petitioner."). Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discussed in Van Skiver v. United States:

> The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d 720, 722 (10th Cir. 1975)(en banc)]. In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured." Pierce v. Cook & Co., 518 F.2d at 723. However, when the post-judgment change in the law did not arise in a related case, we have held that "[a] change in the law or in the judicial view of an established rule of law" does not justify relief under Rule 60(b)(6). Collins v. City of Wichita, 254 F.2d 837, 839 (10th Cir. 1958).

952 F.2d at 1244-45.

### 2.    **Motions to Reconsider Interlocutory Orders.**

Considerable confusion exists among the bar regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, i.e., an order that a district court issues while the case is ongoing, as distinguished from a final judgment. This confusion originates from the fact that the Federal Rules of Civil Procedure do not mention motions to reconsider, let alone set forth a specific procedure for filing them or a standard for analyzing them. A loose conflation in terminology in Servants of the Paraclete v. Does, which refers to rule 59(e) motions -- "motion[s] to alter or amend a judgment" -- as "motions

to reconsider,"[16] compounded that baseline confusion.  Fed. R. Civ. P. 59(e) (emphasis added);
Servants of the Paraclete v. Does, 204 F.3d at 1005.

Final judgments are different from interlocutory orders.  See Fed. R. Civ. P. 54(a)
("'Judgment' as used in these rules includes a decree and any order from which an appeal lies."
(emphasis added)).  In addition to ripening the case for appeal, see 28 U.S.C. § 1291 ("The courts
of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts . . . ."),
the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case
in three ways.  First, for the first twenty-eight days after the entry of judgment, when the court can
entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that
of the Court of Appeals.  See Fed. R. App. P. 4(a)(4)(B).  Even if a party files a notice of appeal,

_____

[16]The Honorable Paul J. Kelly, Jr., Senior United States Circuit Judge for the Tenth Circuit,
who authored Servants of the Paraclete v. Does, refers to rule 59(e) motions as "motions to
reconsider" several times throughout the opinion.  See, e.g., 204 F.3d at 1005.  He uses the term
"motion to reconsider" as an umbrella term that can encompass three distinct motions: (i) motions
to reconsider an interlocutory order, which no set standard governs, save that the district court
must decide them "before the entry of . . . judgment," Fed. R. Civ. P. 54(b); (ii) motions to
reconsider a judgment made within twenty-eight days of the entry of judgment, which the Servants
of the Paraclete v. Does standard governs; and (iii) motions to reconsider a judgment made more
than twenty-eight days after the entry of judgment, which rule 60(b) governs.  There is arguably a
fourth standard for motions to reconsider filed more than a year after the entry of judgment, as
three of the rule 60(b) grounds for relief expire at that point.  Much confusion could be avoided by
using the term "motion to reconsider" exclusively to refer to the first category, "motion to amend
or alter the judgment" exclusively to refer to the second category, and "motion for relief from
judgment" exclusively to refer to the third category (and arguable fourth category).  These are the
terms that the Federal Rules of Civil Procedure -- and other Circuits -- use to describe (ii) and (iii).
The Court agrees with Judge Kelly -- and all he likely meant by using motion to reconsider as an
umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an
entry of final judgment, the court should evaluate it under rule 59(e) or 60(b), as appropriate, rather
than rejecting it as untimely or inappropriate.

the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case. See Fed. R. App. P. 4(a)(4)(B). Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals' jurisdiction trumps the district court's, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion. Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments. First, when a case is not appealed, there is an interest in finality. The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight-day window of robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely. Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals. "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decision-making -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case. The "touchstone document" for this jurisdictional handoff is the notice of appeal, not the final

judgment, see Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice

of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals

and divests the district court of its control over those aspects of the case involved in the appeal."

(citations omitted)); Garcia v. Burlington N. R.R., 818 F.2d 713, 721 (10th Cir. 1987)("Filing a

timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to

the court of appeals.  The district court is thus divested of jurisdiction.  Any subsequent action by

it is null and void."  (citations omitted)); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166,

1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that

divests the district court of jurisdiction."  (citations omitted)), but, because the final judgment starts

the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules and the Tenth

Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-

long period of potentially overlapping trial- and appellate-court jurisdiction that immediately

follows the entry of final judgment, see Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting

that post-final judgment motions at the district court level are "not intended to be a substitute for

direct appeal").

Basically, rather than suddenly divesting the district court of all jurisdiction over the case

-- potentially resulting in the district court being unable to rectify easily fixable problems with the

final judgment before the case goes to the Tenth Circuit, or even requiring appeal of a case that

might otherwise not need to be appealed -- the Federal Rules set forth a jurisdiction phased de-

escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to

limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60

review after twenty-eight days.  In defining the "limited review" that rule 59(e) allows a district court to conduct in the 28-day flux period, the Tenth Circuit, in <u>Servants of the Paraclete v. Does</u>, incorporated traditional law-of-the-case grounds -- the same grounds that inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e). <u>See</u> <u>United States v. Alvarez</u>, 142 F.3d 1243, 1247 (10th Cir. 1998)(departing from the law-of-the-case doctrine in three exceptionally narrow circumstances: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice"  (citation omitted)); <u>Servants of the Paraclete v. Does</u>, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders.  The Federal Rules do not specifically mention motions to reconsider interlocutory orders, but rule 54(b) makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, <u>any order or other decision</u>, however designated, <u>that adjudicates fewer than all the claims</u> or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and <u>may be revised at any time before the entry of a judgment</u> adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphases added).  Rule 54(b) thus (i) provides that a district court can freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability to do so, other than that it must do so "before the entry of judgment."  Fed. R. Civ. P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." Been v. O.K. Indus., 495 F.3d at 1225.  In the Tenth Circuit, "law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another."  Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis added)(citing Been v. O.K. Indus., Inc., 495 F.3d at 1225).  In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'"  Been v. O.K. Indus., Inc., 495 F.3d at 1225 (quoting Avitia v. Metro. Club of Chi., Inc., 49 F.3d 1219, 1227 (7th Cir. 1995)). In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order.  It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors.  Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'"  (citation omitted)). First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to

reconsider challenges.  How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue. A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction,[17] than when the prior ruling is, e.g., a short discovery ruling.  The Court should also look, not to the overall thoroughness of the prior ruling, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges.  A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to

---

[17]The Court typically makes findings of fact and conclusions of law in ruling on these motions.  At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law:

> **Amended or Additional Findings.**  On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly.  The motion may accompany a motion for a new trial under Rule 59.

Fed. R. Civ. P. 52(b).  This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to twenty-eight days.  The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its twenty-eight-day time limit -- does not apply to interlocutory orders.  The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling. See 18B Charles Alan Wright, et al, Federal Practice & Procedure § 4478.1 (2d ed.)("Stability becomes increasingly important as the proceeding nears final disposition . . . . Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling."). For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the motion for protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does grounds. The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii)  new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court should always apply a deferential standard of review.  The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived their right to appeal the alleged error by not raising the appropriate argument.  Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard.  After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration.  The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling, and should try to prevent that party from having to bear the same impositions again.  Basically, even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion that produces the earlier ruling, it should analyze the motion in a different way -- one focused on reducing the

litigation burdens of the party opposing reconsideration.  For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing. If the party loses and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production, and not of persuasion.  The Court analyzes motions to reconsider by picking up where it left off in the prior ruling -- not by starting anew. Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling.  Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider.  Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally.  The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way

of thinking.  See N.M. v. Valley Meat Co., LLC, No. CIV 14-1100, JB/KBM, 2015 WL 9703255, *12-16 (D.N.M. Dec. 14, 2015)(Browning, J.).

## ANALYSIS

The Court will deny Patterson's Reconsideration Motion.  The Court concludes that the Court's decision in the MOO to sever the unilateral carve-out provision from the parties' Arbitration Agreement did not constitute manifest legal error.  Patterson has not, therefore, provided the Court with sufficient basis warranting it to reconsider its MOO under rule 54(b) of the Federal Rules of Civil Procedure.  The Court will deny Patterson's Reconsideration Motion.

## I.  THE PARTIES ASK THE COURT TO RECONSIDER ONLY ITS DETERMINATION THAT THE UNILATERAL RELIEF PROVISION MAY BE SEVERED FROM THE ARBITRATION AGREEMENT.

Patterson asserts that the Court correctly determined that the injunctive relief provision was a unilateral carve-out provision benefitting exclusively the stronger party, Nine Energy, and therefore substantively unconscionable and unenforceable under New Mexico law. See Reconsideration Motion at 1.  Nor does Patterson contest the Court's determination that the sixty-day provision is not unconscionable and, if it is, that the sixty-day provision is severable. See MOO at 2, 330 F. Supp. 3d, at 1287.  Patterson asks the Court to reconsider its MOO only to the extent that the MOO determines that the injunctive relief provision is severable. See Reconsideration Motion at 2.  Accordingly, the Court reaffirms its holdings as to the jurisdictional questions, the determination of the unilateral relief provision's unconscionability, the determination that the sixty-day provision is not unconscionable, and the determination that

the sixty-day provision is severable.  See MOO at 2, 330 F. Supp. 3d, at 1287.  The Court will reconsider only its conclusion that the unilateral relief provision is severable.

II.     **THE COURT JUSTIFIABLY AND NON-EXCLUSIVELY RELIED ON <u>PADILLA</u> IN DETERMINING THE SEVERABILITY OF THE UNILATERAL RELIEF PROVISION.**

Patterson contends that the Court should have followed <u>Cordova</u> and <u>Rivera</u> in determining the unilateral relief provision's severability from the Arbitration Agreement and contends that, based on <u>Cordova,</u> the Court's reliance on <u>Padilla</u> constitutes manifest legal error. <u>See</u> Reconsideration Motion at 1-2.  Patterson argues that, because <u>Padilla</u> dealt with a post-arbitration appeal provision, the Court should not have relied on <u>Padilla</u> in making the severability determination.  <u>See</u> Reconsideration Motion at 4.  Nine Energy responds that the Supreme Court of New Mexico has never overruled <u>Padilla</u> and that the Supreme Court of New Mexico in <u>Cordova</u> cited favorably to <u>Padilla</u> for its recognition that severance is one possible remedial action a court may take to rectify unconscionability in arbitration agreements.  <u>See</u> Response at 1-2.

Contrary to Patterson's implication, the Court did not rely on <u>Padilla,</u> "rather than <u>Rivera</u> or <u>Cordova</u>," to determine that the unilateral relief provision is severable from the Arbitration Agreement.  Reconsideration Motion at 4.  In the section of the Court's MOO analyzing the unilateral relief provision's severability, the Court cited to -- in order of their citation in the MOO -- <u>Cordova</u>, <u>Dalton v. Santander Consumer USA, Inc.</u>, <u>Padilla</u>, <u>Rivera</u>, and <u>State ex rel. State Hwy. Transp. Dep't v. Garley</u>.  <u>See</u> MOO at 41-42 & 42 nn.10 & 11, 330 F. Supp. 3d, at 1312 & nn. 10 & 11.  Although the Court objects to Patterson's characterization of the Court's analysis as relying on <u>Padilla</u> in lieu of considering <u>Cordova</u> and <u>Rivera</u> as inaccurate, the Court also notes that

Padilla, as Nine Energy correctly asserts, has never been overruled and remains Supreme Court of New Mexico precedent. See Response at 1-2. Patterson asserts that the Supreme Court of New Mexico in Cordova distinguishes Padilla "to hold it improper to sever the unilateral carve out from the agreement." Reconsideration Motion at 2. In factually distinguishing Padilla, however, the Supreme Court of New Mexico in Cordova did not overrule it. Rather, the Supreme Court of New Mexico reiterated the guidance it provided courts in Padilla:

> If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result.

Cordova, 2009-NMSC-021, ¶ 39, 208 P.3d at 266 (quoting Padilla, 2003-NMSC-011 ¶ 15, 68 P.3d at 908). Patterson suggests that Padilla's analysis is inapposite here, because Padilla considered a post-arbitration appeal provision, whereas the provision at issue in the MOO involved the arbitration scheme itself. See Reconsideration Motion at 6. Although the Supreme Court of New Mexico recognized in Cordova that Padilla dealt with a post-arbitration appeal provision, the Supreme Court of New Mexico did not conclude that, unlike all other provisions, only post-arbitration appeal provisions are severable. See Cordova, 2009-NMSC-021 ¶ 40, 208 P.3d at 911 ("By contrast, the invalidity in this case involves the arbitration scheme itself, not just the procedures for appeal to the courts after the arbitration phase is over."). Instead, the Supreme Court of New Mexico sought to "avoid a type of judicial surgery that inevitably would remove provisions that were central to the original mechanisms for resolving disputes between the parties." Reconsideration Motion at 6 (quoting Cordova, 2009-NMSC-021, ¶ 40, 208 P.3d at 911).

# III. THE COURT REAFFIRMS ITS DETERMINATION IN THE MOO THAT THE UNILATERAL RELIEF PROVISION IS SEVERABLE BECAUSE IT IS NOT CENTRAL TO THE ARBITRATION SCHEME.

Patterson acknowledges the centrality test from Cordova multiple times throughout his Motion. See Reconsideration Motion at 2-3, 5-7. The Court concludes, however, that Patterson misunderstands or misconstrues the centrality test to suggest that any provision exempting any claim from arbitration is central to the arbitration scheme. Patterson asserts that "the exemptions of certain claims from arbitration are so central to the agreement that they are incapable of separation from the agreement to arbitrate, irrespective of any savings clause included in the agreement." Reconsideration Motion at 3 (quoting Figueroa v. THI of N.M. at Casa Arena Blanca, LLC, 2013-NMCA-077, ¶ 39, 306 P.3d at 494). Patterson mischaracterizes Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC to suggest that any provision exempting a claim from arbitration is central to the arbitration scheme. See Reconsideration Motion at 3. Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC says no such thing. The Court of Appeals of New Mexico in Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC states:

> While we agree that arbitration obligations do not have to be completely equal, and that parties may freely enter into reasonable agreements to exempt certain claims from arbitration, we refuse to enforce an agreement where the drafter unreasonably reserved the vast majority of his claims for the courts, while subjecting the weaker party to arbitration on essentially all of the claims that party is likely to bring. See Rivera, 2011-NMSC-033, ¶ 53, . . . P.3d 803. Defendant cannot avoid the equitable doctrine of unconscionability by drafting an agreement that reserves its most likely claims for a judicial forum, and provides some exemptions from arbitration to the resident so that there is some appearance of bilaterality, when that exemption is completely meaningless in practicality because the resident would rarely, if ever, raise that type of claim against the nursing home.

2013-NMCA-077, ¶ 30, 306 P.3d at 491 (emphasis added). Patterson also suggests that all

unilateral carve-outs are central to the agreements in which they are contained, asserting that, in

Cordova, the Supreme Court of New Mexico "explicitly determined that unilateral carve-outs --

unlike the invalid post arbitration appeal provision in Padilla -- could not be severed from the

agreement particularly 'in light of the categorization in the agreements of specific kinds of access

to the courts [the defendant] had insisted on for itself.'"   Reconsideration Motion at 5 (quoting

Cordova, 2009-NMSC-021, ¶¶ 39-40, 208 P.3d at 911).   Cordova did not issue such a broad

pronouncement.  Rather than prohibiting the severance of any unilateral carve-out provision from

an arbitration agreement, the Supreme Court of New Mexico determined that the particular

unilateral carve-out at issue in Cordova was not severable in light of the categorization of specific

kinds of access to the courts that World Finance, the defendant, had insisted on for itself.  The

Supreme Court of New Mexico devoted considerable text to outlining the several kinds of access

World Finance reserved for itself in the provision at issue.  See Cordova, 2009-NMSC-021, ¶ 27,

208 P.3d at 908-09.  The Supreme Court of New Mexico noted in Cordova that:

> Cordova had no rights under the form agreement to go to any court for any reason
> whatsoever, including disputes about the validity of any of World Finance's form
> loan or arbitration documents, issues about the terms of World Finance's contract,
> claims for fraud and misrepresentation, grievances related to servicing or
> collection, or claims based on federal or state consumer protections, such as the
> New Mexico Unfair Practices Act, and tortious debt-collection causes of action
> asserted in Cordova's complaint.  Those are the claims a borrower is most likely
> to litigate in a dispute with a lender, and the very ones the lender is least likely to
> want to litigate.  It is highly unlikely that World Finance will find itself at odds
> with the contractual terms of its own form agreements, or the circumstances of its
> lending or collection practices, or claim it was the victim of a fraudulent consumer
> scheme, or have any other reason to make a claim against its borrowers for
> violation of consumer protection laws.

2009-NMSC-021, ¶ 27, 208 P.3d at 908-09 (emphasis added).  In sum, the Supreme Court of New

Mexico has never stated that any provision exempting any claim from arbitration is central to the arbitration scheme; rather, as in Cordova, the Supreme Court of New Mexico has carefully considered which claims the drafting party has attempted to exempt from arbitration, and whether those are the most likely claims the parties might bring.

Here, the Arbitration Agreement states:

> Notwithstanding the provisions of this Agreement, the Company may bring an action in any court of competent jurisdiction for injunctive relief to enforce the Employee's obligations with respect to the confidentiality and protection of trade secrets and other non-public information belonging to the Company, or with respect to any non-competition, non-solicitation, or any other restrictive covenant provisions in any separate agreement between the Company and the Employee.

Arbitration Agreement at 4. The Court did not conclude here that the trade secrets and restrictive-covenant-related claims are the claims that Patterson is most likely to bring, and that Nine Energy is least likely to litigate. This case is about a failure to pay overtime wages, for instance, and has "nothing to do with seeking injunctive relief to protect confidential information." MOO at 42, 330 F. Supp. 3d, at 1311. The Arbitration Agreement defines "dispute" as:

> All legal and equitable claims, demands, disputes, controversies, issues, and disagreements, of whatever nature or kind, whether in contract, tort, under statute or regulation, or any other law or source of legal obligation, including but not limited to those relating to, concerning, or arising out of this Agreement; the interpretation or subject matter of this Agreement or program; the application for employment and employment of any Employee; wages or other compensation received by or owed to any Employee, including minimum wage and overtime pay; employee benefits; any matters concerning the Parties' relationship; any matters concerning the Employee's working conditions, including allegations of discrimination, harassment, and retaliation; any personal injury or fatality allegedly incurred in any way relating to the workplace or employment by the Company; any prior resolution of settlement of a Dispute; and all others arising out of Employee's employment or application for employment with Company, including any past, present, and future employment, and including but not limited to those relating to the denial, separation, terms, conditions, and benefits of such

employment, except for those matters described in the section entitled "Exclusions" in this Agreement.

Arbitration Agreement at 2. The Arbitration Agreement submits all disputes to final and binding arbitration. See Arbitration Agreement at 3. The Arbitration Agreement also permits Patterson to file a "complaint or charge regarding a Dispute with any federal, state, or local governmental agency, including without limitation the Equal Employment Opportunity Commission, the Department of Labor, and the National Labor Relations Board." Arbitration Agreement at 4. Patterson may, in other words, approach an agency to represent his interests in litigation. Unlike the agreement in Cordova, the Arbitration Agreement here does not leave Patterson with "no rights under the form agreement to go to any court for any reason whatsoever," while Nine Energy enjoys those rights. Cordova, 2009-NMSC-021, ¶ 27, 208 P.3d at 908. Patterson and Nine Energy both formally agree to submit virtually all possible claims to arbitration, Patterson may litigate other claims through a federal, state, or local agency, and the only claims Nine Energy reserved to itself in the unilateral carve-out provision are unrelated to the parties' employment relationship. By severing the unilateral carve-out provision, the parties are left with an agreement still mutually binding them to arbitration, and by which Patterson still enjoys the right to litigate certain claims in the courts. The unilateral carve-out provision can be severed "without substantially altering the method of dispute resolution contractually agreed on by the parties." Rivera, 2011-NMSC-033, ¶ 56, 259 P.3d at 819.

Patterson seems to suggest that, the more unconscionable a provision is, the more central it is to the arbitration scheme. See Reconsideration Reply at 2 ("Clearly, the unilateral carve out here . . . is more unconscionable than the Agreement in Cordova."). The Supreme Court of New

Mexico, however, has not concluded that the degree of unconscionability of the provision at issue bears on the decision to sever. Instead, the Supreme Court of New Mexico has counseled that the agreement which remains after severance must be one on which the parties agreed, so as to "avoid a type of judicial surgery that inevitably would remove provisions that were central to the original mechanisms for resolving disputes between the parties." Cordova, 2009-NMSC-021, ¶ 39, 208 P.3d at 911. The Court's inquiry must be whether, after severance, the Arbitration Agreement is a fair and balanced manifestation of the parties' intent, and here, the Court concludes that the Arbitration Agreement fairly manifests the parties' intent, because the provision at issue is not central to the arbitration scheme. See Cordova, 2009-NMSC-021, ¶ 39, 208 P.3d at 911.

## IV. THE LACK OF A SAVINGS CLAUSE DOES NOT INDICATE THE PARTIES' MANIFESTED INTENT TO DISCARD THE ENTIRE ARBITRATION AGREEMENT IF A SINGLE PROVISION IS FOUND UNCONSCIONABLE.

Patterson argues that, because the Arbitration Agreement lacks a savings or severance clause manifesting the parties' intent to save the contract if a particular provision is rendered unenforceable, and, under New Mexico law, the parties' manifested intention governs the severability determination, the Court committed manifest legal error in severing the provision despite the parties' lack of manifested intention to save the agreement. See Reconsideration Motion at 7-8 (citing Arrow Gas Co. of Dell City v. Lewis, 1962-NMSC-145, ¶ 24, 377 P.2d at 659; Fancher v. Bd. of Comm'rs of Grant Cty., 1921-NMSC-039, ¶ 63, 210 P. at 248). Some district courts have stated that when an arbitration agreement does not contain a savings clause, the entire agreement must be stricken. See, e.g., Nesbitt v. FCNH, Inc., 74 F. Supp. 3d 1366, 1375 (D. Colo. 2014)(Jackson, J.)("Because there is no savings clause and because the agreement itself

is unambiguous its provisions cannot be stricken, rendering the entire Arbitration Agreement unenforceable."). See also Daugherty v. Encana Oil & Gas (U.S.A.), Inc., No. 10-cv-02272 WJM/KLM, 2011 WL 2791338, at *12 (D. Colo. July 15, 2011)(Martinez, J.)("Accordingly, when a contract contains a void arbitration provision, it must either be deemed unenforceable when there is no savings clause to the contract . . . ."). The Tenth Circuit considered Nesbitt v. FCNH, Inc., but did not rely on the absence of a savings clause in affirming the district court's invalidation of the agreement. See Nesbitt v. FCNH, Inc., 811 F.3d 371, 380 (10th Cir. 2016)(concluding that the agreement was internally inconsistent and ambiguous, and, therefore, affirming the district court's order denying the motion to stay proceedings and compel arbitration). Although New Mexico courts have not expressly addressed the import of an agreement's lack of a savings clause, even when arbitration agreements contain savings clauses, the Supreme Court of New Mexico does not interpret the existence of the savings clause to govern the severability determination. See Figueroa v. THI of N.M. at Casa Arena Blanca, LLC, 2013-NMSC-077, ¶ 39, 306 P.2d at 494 ("Here, like the arbitration clauses in Cordova and Rivera, the exemptions of certain claims from arbitration are so central to the agreement that they are incapable of separation from the agreement to arbitrate, irrespective of any savings clause included in the agreement."). Although the Supreme Court of New Mexico has not commented on the severability of unconscionable provisions from an arbitration agreement when the agreement contains no savings clause, Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC indicates that the Supreme Court of New Mexico does not view the existence or non-existence of a savings clause as bearing on the severability determination. The test from Cordova contains no mention of a savings clause and states only

that: "If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term." 2009-NMSC-021, ¶ 39, 208 P.3d at 911. The court should "avoid a type of judicial surgery that inevitably would remove provisions that were central to the original mechanisms for resolving disputes between the parties." Cordova, 2009-NMSC-021, ¶ 39, 208 P.3d at 911. The Arbitration Agreement here contains no savings clause, nor does it contain a clause expressly stating the parties' desire to invalidate the entire agreement if a single arbitration clause is unconscionable.

Considering the strong state and federal public policies in favor of arbitration, see Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d at 1488-89; United Tech. & Res. Inc. v. Dar Al Islam, 1993-NMSC-005, ¶ 11, 846 P.2d at 309, the Court is reluctant to invalidate a non-illusory arbitration agreement when the single unconscionable provision can be cleanly struck, simply because the parties did not include a savings clause. Removing only the unconscionable clause does not constitute judicial surgery, because of the clause's non-centrality. In the MOO, the Court concludes that the Arbitration Agreement contains adequate consideration. See MOO at 34, 330 F. Supp. 3d, at 1308. The Court concludes that "both parties mutually exchanged sought-after promises to forfeit their respective rights to a jury trial and, instead, promised to arbitrate a long list of potential disputes." MOO at 37, 330 F. Supp. 3d, at 1308. Although there is no savings clause, the Court can infer, from the parties' mutual exchange of promises and agreement to be bound, that the parties would not prefer to invalidate the entire six-page, twenty-paragraph

Arbitration Agreement, because a single provision, not central to the arbitration scheme, is unconscionable.  See Arbitration Agreement at 1-6.

## V. __TATUM V. PROBUILD, INC.__ IS NOT BINDING ON THE COURT, AND, TAKEN FOR ITS PERSUASIVE VALUE, DOES NOT ALTER THE COURT'S ANALYSIS OR __CONCLUSION.__

Patterson cites to Tatum v. ProBuild Co., LLC, and contends that Senior Judge Hansen concludes in Tatum v. ProBuild Co., LLC that a nearly mutual injunctive relief clause for the enforcement of restrictive covenants rendered the entire arbitration agreement at issue unenforceable.  See Reconsideration Notice at 1.  Patterson provides the Court with a copy of Judge Hansen's opinion in Tatum v. ProBuild Co., LLC.  Nine Energy then argued that Senior Judge Hansen did not discuss severability in Tatum v. ProBuild Co., LLC.  See Oct. 25 Tr. at 9:7-11 (Mann).  Patterson argued that, in Tatum v. ProBuild Co., LLC, Senior Judge Hansen concluded that the provision at issue was one-sided, because both parties could not go to court to address the same occurrence at the same time.  See Oct. 25 Tr. at 12:3-7 (Siegel).

Tatum v. ProBuild Co., LLC is a District of New Mexico opinion and is not binding on the Court.  See, e.g., Nat'l Union Fire Ins. v. Allfirst Bank, 282 F. Supp. 2d 339, 351 (D. Md. 2003)(Nickerson, J.)("Of course, no decision of a district court judge is technically binding on another district court judge, even within the same district.").  Furthermore, in Tatum v. ProBuild Co., LLC, Senior Judge Hansen concludes that the entire arbitration agreement is procedurally unconscionable.  See 2013 WL 12329840, at *6.  Senior Judge Hansen never discusses severability and declines to enforce the arbitration agreement, because "[b]oth procedural and substantive unconscionability are present."  2013 WL 12329840, at *11.  Senior Judge Hansen states: "In sum,

the contract terms here are unfairly favorable to ProBuild, the stronger party who drafted the agreement, while precluding a meaningful choice by Plaintiff, whose assent was conditioned on her continued employment with a company for whom she had worked for 16 years." 2013 WL 12329840, at *11. Here, Patterson and Nine Energy entered into a mutual agreement, which Patterson signed, and which contains terms that favor Patterson, not only terms that favor Nine Energy. As the Court concluded in its MOO:

> Without the injunctive relief provision, not only does the Arbitration Agreement "now contain[] a mutual agreement to binding arbitration," 2003-NMSC-011, ¶ 18, 68 P.3d at 909, it contains some unilateral carve-outs that benefit exclusively the weaker party with less bargaining power. See Arbitration Agreement at 3 (noting that the Arbitration Agreement "does not apply to claims for workers' compensation benefits, unemployment compensation benefits" and other claims that only an employee would bring).

MOO at 42 n.10, 330 F. Supp. 3d, at 1311 n.10. The Court agrees with Senior Judge Hansen that, if an arbitration agreement is procedurally and substantively unconscionable, the court should strike it down. That is not, however, the case here. The Court concludes, therefore, that Tatum v. ProBuild Co., LLC did not consider the severability question in the context of an agreement that is not procedurally unconscionable, and that, absent the stricken provision, is not substantively unconscionable, and, accordingly, Senior Judge Hansen's decision does not change the Court's severability analysis here.

## VI. THE COURT DECLINES TO CERTIFY THE QUESTION TO THE SUPREME COURT OF NEW MEXICO, WHICH HAS ALREADY DECIDED THE RELEVANT QUESTION.

Patterson moves the Court to certify to the Supreme Court of New Mexico the question whether the unilateral carve-out provision is severable from the Arbitration Agreement. Because

the Court concludes that the Supreme Court of New Mexico has spoken on the issue, the Court will not certify the question to the Supreme Court of New Mexico. Pursuant to N.M. Stat. Ann. § 39-7-4, the Supreme Court of New Mexico may answer questions that the federal district court, in its sound discretion, certifies to it "if they involve propositions of New Mexico law that may be determinative of the matter before the certifying court and there are no controlling precedents from the New Mexico appellate court." Anderson Living Tr. v. Conocophillips Co., Nos. CIV 12-0039 JB/KBM, CIV 12-0040 JB/LFG, 2013 WL 11549178, at *7 (D.N.M. Sept. 18, 2013)(Browning, J.)(citing Swink v. Fingado, 1993-NMSC-013, ¶ 1 n.1, 850 P.2d at 979 n.1). First, the issue of arbitrability does not involve propositions of New Mexico law that may be determinative of the matter before the Court. Even if the Court got the arbitration issue wrong, the entire case remains to be decided by someone. The issue is not a case "determinative" issue. Arbitration is a procedural issue, and not a decision on the merits. All the merits issues remain in the case, regardless of who decides them. Also, the Court is merely staying the case and not dismissing it. There may be other issues with which the Court has to deal. The Court may have to enter a judgment adopting or interpreting the arbitration award. Finally, the Court will have to dismiss the case at some point. This case is a long way from being over, and the Court cannot soundly say the arbitration issue before it is determinative. Second, there are controlling precedents from the New Mexico appellate court. It is true that there is not an on-point, factually identical case from the Supreme Court of New Mexico. But there are controlling appellate cases. The Court has worked hard to fairly and faithfully interpret and apply the controlling appellate New Mexico precedent, following Supreme Court and Tenth Circuit precedent, which gave courts the duty to

predict how the state's supreme court will rule on an issue.  See Stoner v. N.Y. Life Ins., 311 U.S. at 467; Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins., 891 F.2d at 774.  As directed, the Court (i) "follow[ed] the most recent decisions of the state's highest court"; and (ii) sought "guidance from decisions rendered by lower courts in the relevant state . . . and the general weight and trend of authority in the relevant area of law." Wade v. EMCASCO Ins., 483 F.3d at 665-66 (citations and internal quotation marks omitted).  See Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1214 (D.N.M. 2008)(Browning, J.)(declining to certify a legal question and noting that the "Court's task is to consider [New Mexico Courts of Appeals] carefully and determine whether there is a good indication of how the Supreme Court of New Mexico would rule if the question was presented to it").  In Cordova, Rivera, and Padilla, the Supreme Court of New Mexico has established that severability is an available remedy for unconscionable arbitration provisions and that a provision may be severed so long as it is not central to the arbitration scheme itself, such that severing it would result in an agreement not reflective of the parties' manifested intentions.

While certifying questions to the state supreme court can "save time, energy, and resources," Lehman Bros. v. Schein, 416 U.S. 386, 391 (1974), Patterson is not doing the Court any favors by asking it to certify the question after the Court has already done a lot of work in ascertaining the applicable law.  If Patterson wanted to save the Court time and effort, he should have sought certification before receiving an adverse decision from the Court.  See XTO Energy Inc. v. ATD, LLC, 189 F. Supp. 3d 1174, 1207 (D.N.M. 2016)(Browning, J.)(declining to certify a question to the Supreme Court of New Mexico when the party sought certification only after receiving an adverse decision); Martinez v. Martinez, No. CIV 09-0281 JB/LFG, 2013 WL

3270448, *47 (D.N.M. June 3, 2013)(Browning, J.)(declining to certify a question when the Court could interpret New Mexico precedent); Arnold v. Farmers, Ins. of Ariz., 827 F. Supp. 2d 1289, 1297 (D.N.M. 2011)(Browning, J.)(refusing to certify a question after the Court had already ruled on it).

The Tenth Circuit disfavors late requests for certification. See Massengale v. Okla. Bd. of Exam'rs in Optometry, 30 F.3d at 1331 (stating that the Tenth Circuit generally "will not certify questions to the state supreme court when the requesting party seeks certification only after having received an adverse decision from the district court."); Armijo v. Ex Cam, Inc., 843 F.2d at 407 (noting that "[c]ertification is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law" and that "the plaintiff did not request certification until after the district court made a decision unfavorable to her"); Boyd Rosene & Assoc., Inc. v. Kan. Mun. Gas Agency, 178 F.3d at 1364 ("Late requests for certification are rarely granted . . . and are generally disapproved, particularly when the district court has already ruled."); Harvey E. Yates Co. v. Powell, 98 F.3d at 1229 n.6 (denying request for certification in removed case where the moving party had not moved for certification in the district court and had received an adverse ruling). The Court will not, therefore, certify the question submitted to the Supreme Court of New Mexico.

**IT IS ORDERED** that: (i) the Court reaffirms its determination in the MOO, based on the Court's correct, but not exclusive, reliance in Padilla, that the injunctive relief provision in the Arbitration Agreement is severable; and (ii) the Court declines to certify the severability question to the Supreme Court of New Mexico. Accordingly, the Plaintiff's Reconsideration Motion, filed

September 15, 2018 (Doc. 25) is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Jack L. Siegel
Siegel Law Group, P.L.L.C.
Dallas, Texas

-- and --

J. Derek Braziel
Travis Andrew Gasper
Lee & Braziel, L.L.P.
Dallas, Texas

       *Attorneys for the Plaintiff*

Christopher S. Mann
Jones Walker, L.L.P.
New Orleans, Louisiana

-- and --

Jennifer L. Anderson
Jones Walker, L.L.P.
Baton Rouge, Louisiana

       *Attorneys for the Defendant*